ASSESSORS OF BOSTON *vs.* BOSTON PILOTS' RELIEF SOCIETY.

Suffolk.    November 12, 1941. — March 31, 1942.

Present· FIELD, C.J., DONAHUE, QUA, DOLAN, & RONAN, JJ.

*Tax,* Exemption; On personal property: exemption. *Charity. Corporation,* Charitable. *Words,* "Benevolent," "Charitable," "Charity."

A Massachusetts corporation organized for the stated purpose of furnishing aid and relief·to the pilots of Boston and their families, the members of which were licensed pilots elected to membership, each of whom was required to pay substantial admission and annual dues and also a large initial assessment repayable to him or his estate upon his retirement or death, and was entitled as of right, irrespective of his need, to substantial monthly payments while incapacitated from work by age, sickness or accident, with a provision for payments to his widow and children upon his death irrespective of need, was not a benevolent or charitable institution within G. L. (Ter. Ed.) c. 59, § 5, Third, and its personal property was not exempt from taxation.

APPEAL from a decision by the Appellate Tax Board.

The case was submitted on briefs.

*J. W. Kelleher,* Assistant Corporation Counsel, for the assessors of Boston.

*G. L. Barnes,* for the taxpayer.

DOLAN, J.    This is an appeal, by the board of assessors of the city of Boston, from a decision of the Appellate Tax Board abating a tax for the year 1938, assessed upon two pilot boats owned by the Boston Pilots' Relief Society, a Massachusetts corporation.

The relevant facts are as follows: The taxpayer, hereinafter referred to as the society, was duly incorporated by St. 1866, c. 91, entitled "An Act to incorporate the Boston Pilots' Relief Society." Section 1 sets forth that, the purpose for which the society was founded is that "of furnishing aid and relief to the pilots of Boston and their families, as occasion may require; with all the rights and privileges, and subject to all the duties, restrictions and liabilities set forth in the general laws which now are or may hereafter be in force relating to such corporations."

The society adopted rules and regulations to govern the conduct of its affairs. Its officers include a committee of relief and visitation consisting of three members. The eligibility requirements for membership in the society are fixed by its rules and regulations, under which only an acting pilot who holds a license from the board of pilot commissioners may become a member, and then only after he files his application, pays his admission fee, and receives the unanimous vote of all the members present and voting at the next annual or special meeting of the society.

The admission fee is $25, and the dues are $100 a year. The rules and regulations provide that "A pilot upon becoming a member shall also, as an initial assessment, pay to the treasurer a sum equal to such pilot's proportionate share of $107,500 apportioned among all the members of said society." There having been at the time of the hearing before the Appellate Tax Board twenty-four members of the society, a new member would be required to pay one twenty-fourth of $107,500, or approximately $4,400. Upon his retirement he, or upon his death his estate, would be entitled to have that sum repaid without interest. This assessment does not become a part of the fund but is divided among members who have at some time previous contributed to the repayment, to a retired member or to the estate of one deceased, of the amount of his initial assessment. Apparently this fund thus remains constant. It is commingled with the general funds of the society and invested, and the income from all investments is used for the "support and aid of the beneficiaries."

Under its rules and regulations members of the society who by age, sickness, or accident are prevented from pursuing their calling as pilots, are to be paid a sum not less than $125 payable monthly by the society. A member's right to these payments does not accrue until he has been idle for a month owing to the causes just referred to, and such payments cease upon his return to work.

The rules and regulations further provide that, upon the death of a member, his widow shall receive an annual sum not exceeding $300, as determined by vote of the society,

and that each of his surviving children shall receive annually a sum not exceeding $200, until such child arrives at the age of sixteen years, provided that the income of the society is sufficient therefor. Further provision is made for the payment of $300 for the funeral expenses of a deceased member. Provision is also made for a floral tribute and two carriages.

The funds of the society accumulated since its formation amount to $222,279.78. It also owns the two pilot boats before referred to. They are carried on the society's books at a value of $35,000. The society has no capital stock and no part of its capital funds has been used for its purposes, nor has any of its income or profits ever been distributed among its members or their families except as before recited. Its rules and regulations make no provision for the distribution of income or profits except for aid and relief to beneficiaries. Many years ago the society received a gift of $80,000, probably from a ship owner. Since the records of the society were destroyed by fire in 1925, the Appellate Tax Board was unable to find what if any conditions were attached to this gift. It has been treated and used, however, as an outright, unconditional gift for the purposes for which the society was organized. It "is to be so considered."

In the year 1938, approximately $11,000 of the income of the society from its invested funds was distributed among six retired pilots and eleven widows of deceased pilots. No payments were made to children of deceased pilots in that year, the income being insufficient therefor.

The society has owned pilot boats since 1901. The two boats now owned by it are called "The Pilot" and the "Northern Light" respectively. These boats are leased by the society to "those individuals who now or hereafter from time to time compose the pilots of Boston Harbor as duly licensed and commissioned by the pilot commissioner of Massachusetts," at a rental of $840 a month. Expenses of operation, repairs to sails and rigging and other minor expenses are borne by the lessees. The income derived from the rental of the boats is commingled with the society's

general funds. The lessees' profits from the use of the boats are divided among them by an arrangement to which the society is not a party, and it does not "participate in the business in any way."

In 1938, the board of assessors of the city of Boston valued "The Pilot" at $15,000 and assessed a tax thereon of $619.50. At the same time it valued the "Northern Light" at $30,000 and assessed a tax thereon of $1,239. This was the first time that a tax had been assessed upon any property of the society. The "commissioner of corporations and taxation has always classified the society as a charitable corporation within the meaning of G. L. c. 180, and . . . has never assessed a tax on its property or income." Nor have the Federal authorities so done. The society paid the taxes in question on July 26, 1939, duly applied to the assessors for an abatement, and upon its denial appealed to the Appellate Tax Board.

The Appellate Tax Board, hereinafter referred to as the board, further found as "facts" that all net income of the society is used for the purposes specified in its charter, that its beneficiaries comprise a class indefinite as to number, that the purposes of the society are benevolent and charitable, and that none of its income is divided among its members or is used or appropriated for other than benevolent and charitable purposes, and ruled that the "Society is a charitable corporation of the character described in Chapter 59, Section 5, Clause 3 and its personal property is therefore exempt from taxation under the provisions thereof." The board denied certain requests for rulings made by the assessors, among them that upon all the evidence and findings of fact the society is not a literary, benevolent, charitable or scientific institution, or temperance society incorporated in the Commonwealth and is therefore not entitled to the exemption from taxation provided by G. L. (Ter. Ed.) c. 59, § 5, Third; that the society is not a corporation organized for any of the purposes set forth within G. L. (Ter. Ed.) c. 180, § 2.

The evidence is not reported, and hence the conclusions of the board, as well as the general finding for the society,

which imports a finding of all facts necessary to support it not inconsistent with facts actually found, are reviewable in accordance with the principles set forth in *Assessors of Boston* v. *Garland School of Home Making*, 296 Mass. 378, 383, 384, and cases cited.

The society does not contend that the property in question is exempt from taxation under any provisions of statute other than G. L. (Ter. Ed.) c. 59, § 5, Third. The decisive question therefore is whether the conclusions of the board, that the society was a benevolent and charitable corporation and that its personal property was exempt from taxation under § 5, Third, were warranted upon the facts found by the board. That is a question of law.

General Laws (Ter. Ed.) c. 59, § 5, Third, provides, so far as here pertinent, for exemption from taxation of "Personal property of literary, benevolent, charitable and scientific institutions and of temperance societies incorporated in the commonwealth . . . except as follows: (a) If any of the income or profits of the business of the institution or corporation is divided among the stockholders or members, or is used or appropriated for other than literary, educational, benevolent, charitable, scientific or religious purposes, its property shall not be exempt."

The word "benevolent" as used in connection with the word "charitable" is synonymous therewith, *Assessors of Boston* v. *Garland School of Home Making*, 296 Mass. 378, 385, and the determination of whether the property in question of the society is exempt from taxation under § 5, Third, depends upon whether it meets the test of a public charity. *Little* v. *Newburyport*, 210 Mass. 414, 415. Institutions of a general charitable nature are within the scope of the exemption.

If we were confined in our inquiry to the statement of its purposes in the act incorporating the society we would have no difficulty in holding that those purposes might be so exercised as to bring it within the definition of a public charity. But as was said in *Assessors of Boston* v. *Garland School of Home Making*, 296 Mass. 378, 384, "The answer to the question 'whether the institution is . . . charitable

. . . within the meaning of . . . [that word] in the statutes' 'will depend upon the language of its charter or articles of association, constitution and by-laws, and upon the objects which it serves and the method of its administration' . . . that is, 'upon its purposes declared and the work done.' *Parkhurst* v. *Treasurer & Receiver General,* 228 Mass. 196, 199–201.''

In the present case it is plain that the society is not a literary or scientific institution or a temperance society. There are no elements in its declared purposes other than aid or relief to its members and, in the event of death, their widows and their children under the age of sixteen years, the members themselves receiving not less than $125 a month if incapacitated by age, sickness or accident, without reference to any question of actual need. In like manner the provisions for their widows and certain minor children are. not restricted to cases of need. While it is settled that the word "charity" is of wider import than mere almsgiving, *New England Sanitarium* v. *Stoneham,* 205 Mass. 335, 342, yet where, as here, the sole object of the society is expressed to be to give aid and relief, we think it is competent to consider the conditions under which the aid or relief is given and the essence of its substance rather than its description. The fees for admission, the annual dues, and the compulsory requirement of an initial assessment of approximately $4,400 cannot properly be classified as moderate. Compare *Newton Centre Woman's Club, Inc.* v. *Newton,* 258 Mass. 326, 330. The benefits derived by its members through payments of not less than $125 a month in case of incapacity without respect to need, particularly when considered in connection with the return to them upon retirement or to their estates in case of death of the initial assessment paid by them upon admission to membership, constitute an obviously large return upon that assessment and the annual dues. A retired member thus becomes entitled to certain substantial benefits as a personal right, which he can enforce "in a court of law." *Coe* v. *Washington Mills,* 149 Mass. 543, 547. See *Dolan* v. *Court Good Samaritan,* 128 Mass. 437. In *Minns* v.

*Billings*, 183 Mass. 126, 128, it is said: "The decisions in *Coe* v. *Washington Mills*, 149 Mass. 543, *Newcomb* v. *Boston Protective Department*, 151 Mass. 215, *Young Men's Protestant Temperance & Benevolent Society* v. *Fall River*, 160 Mass. 409 . . . mark the distinction between public charities and mutual benefit associations supported by contributions or assessments from their members, whereby the members become entitled to certain benefits in case of sickness or accident, as a personal right." See *Dolan* v. *Court Good Samaritan*, 128 Mass. 437, 439. The present case bears much more resemblance in its methods of administration to those cases which we have just referred to, than to cases concerning hospitals, *New England Sanitarium* v. *Stoneham*, 205 Mass. 335, *Dillaway* v. *Burton*, 256 Mass. 568, or societies for the benefit of the community, *Newton Centre Woman's Club, Inc.* v. *Newton*, 258 Mass. 326, or organizations for the general relief of the sick, infirm and indigent. *Fellows* v. *Miner*, 119 Mass. 541. *Minns* v. *Billings*, 183 Mass. 126. Such personal enforceable rights as are enjoyed by those elected to membership in the society here involved can hardly be said to be charitable in character.

"While reasonable exemptions based upon various grounds of public policy are permissible, yet taxation is the general rule. . . . It is for this reason that statutes granting exemptions from taxation are strictly construed." *Animal Rescue League of Boston* v. *Assessors of Bourne*, 310 Mass. 330, 332, and cases cited. "Any doubt must operate against the one claiming tax exemption, because the burden of proof is upon the one claiming an exemption from taxation to show clearly and unequivocally that he comes within the terms of the exemption." *Boston Symphony Orchestra, Inc.* v. *Assessors of Boston*, 294 Mass. 248, 257, and cases cited. In our opinion, upon the facts disclosed by the record, the society has failed to sustain that burden.

It follows that the petition for abatement must be dismissed, and it is

*So ordered.*