BAYSTATE MEDICAL CENTER & others[1] vs. BLUE CROSS
OF MASSACHUSETTS, INC.

Suffolk. October 9, 1980. — February 6, 1981.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, LIACOS, & ABRAMS, JJ.

*Hospital Service Corporation. Health Maintenance Organization. Statute, Construction.*

The rate of reimbursement to hospitals by a hospital service corporation
which functions as the insurance carrier for a health maintenance
organization was determined by G. L. c. 176G, the statute governing
health maintenance organizations, rather than by G. L. c. 176A, the
general statute governing hospital reimbursement rates. [489-493]

CIVIL ACTION commenced in the Supreme Judicial Court
for the county of Suffolk on August 9, 1979.

The case was reported by *Kaplan, J.*

*Francis D. Dibble, Jr.,* for the plaintiffs.

*Jeffrey Swope* for the defendant.

*Joan Stoddard,* Assistant Attorney General, was present
but did not argue.

ABRAMS, J. By their complaint the plaintiffs, four
general acute care hospitals, seek a declaration as to the rate
of reimbursement to be paid to them by the Medical West
Community Health Plan (Medical West), a health mainte-
nance organization (HMO)[2] operated and controlled by Blue

---

[1] The four plaintiffs are Baystate Medical Center, Holyoke Hospital,
Mercy Hospital, and Providence Hospital. Each hospital is organized
under G. L. c. 180, and licensed under G. L. c. 111, § 51.

[2] A health maintenance organization (HMO) is an entity which pro-
vides a full range of health care benefits to voluntarily enrolled members
either directly or by contractual agreements. Enrolled members purchase
the services of an HMO for a prepaid or aggregate fixed sum. An HMO in
Massachusetts must be financially accountable and must be able to deliver
the services it purports to offer. HMO rates to subscribers may be dis-
approved by the Commissioner of Insurance. See G. L. c. 176G.

Cross. G.L. c. 231A. Blue Cross filed an answer admitting an actual controversy existed, and it filed a counterclaim. Thereafter, the parties filed a stipulation of agreed facts[3] and a single justice of this court reserved and reported the case without decision.[4]

At issue is whether the rate of reimbursement Blue Cross must pay when it acts as a carrier for an HMO is determined by G. L. c. 176A,[5] the general statute governing Blue Cross hospital reimbursement rates. In support of their claim that the c. 176A rate does not apply, the plaintiffs rely on the absence of any rate limitation in the statute governing HMO's, G. L. c. 176G. Blue Cross argues that it is functioning in its usual capacity as a hospital care insurer under the HMO's hospital plan, and therefore the rate authorized by G. L. c. 176A does apply. We interpret the language of c. 176A and c. 176G in light of the intent of the Legislature, and "we consider the several statutes in question, not in isolation but in relation to each other and to other statutes, re-

[3] The parties also filed a stipulation of dismissal without prejudice of the plaintiffs' complaint against the Commissioner of Insurance.

[4] The record consists of the stipulation, a documentary appendix, the complaint, the answer, and the counterclaim.

[5] General Laws c. 176A, § 5, sixth par., as amended through St. 1974, c. 812, § 3, in pertinent part reads as follows: "All rates of payment to hospitals made by such corporation, under such contracts, shall be approved in advance by the commission. Any such approval may be withdrawn by the commission at any time as hereinafter provided. No rates of payment shall be approved, nor their continuance be permitted by the commission, unless such rates reflect *reasonable costs or* are based on *charges made to the general public, whichever is lower*" (emphasis supplied).

The parties have stipulated that the c. 176A, § 5, sixth par., rate "is different from the amount each plaintiff charges to patients who are not members of a Blue Cross hospital service plan and is lower than each plaintiff's schedule of charges for the same services approved by the Massachusetts Rate Setting Commission pursuant to G. L. c. 6A, § 31 et seq." Blue Cross pays the plaintiff hospitals less than each plaintiff's schedule of charges by 8.5% (Providence Hospital) to 22.7% (Bay State Medical Center). See generally 1964 Senate Rep. No. 958, Final Report of the Special Commission to Investigate and Study the Laws Relative to Nonprofit Hospital and Medical Service Corporations, and the Rising Cost of Hospital and Medical Care and Hospital Accommodations 39.

sorting to their origins, their historic development, and their present language." *Pereira* v. *New England LNG Co.*, 364 Mass. 109, 115 (1973). For the reasons stated in the opinion we think that while Blue Cross's position is plausible, a careful reading of the statutes in light of their purposes favors the conclusion suggested by the plaintiffs.[6]

We summarize the agreed facts. The plaintiffs are four hospitals operating in the Chicopee-Holyoke-Springfield area. Pursuant to G. L. c. 176G, on May 31, 1978, Blue Cross filed with the Commissioner of Insurance an application for a license for a health maintenance organization[7] to be known as Medical West Community Health Plan, to serve the greater Chicopee-Holyoke-Springfield area. The license was granted, and Medical West commenced operations on October 6, 1978. Medical West provides its members with comprehensive doctors' services, inpatient and outpatient hospital care, emergency services and other forms of health care. See note 2, *supra*. Medical West provides some of these directly,[8] and arranges for other provid-

---

[6] The parties also argue at length as to the interpretation and application of the existing contract between Blue Cross and all provider hospitals pursuant to G. L. c. 176A. The contract (HA-27), however, provides that disputes between the parties be resolved by arbitration. The language chosen by the parties requires arbitration of disputes concerning "the interpretation or application" of the agreement. Arbitration clauses "should be construed as broadly as the parties obviously intended," *Quirk* v. *Data Terminal Syss., Inc.*, 379 Mass. 762, 765 (1980), quoting from *Glenn Acres, Inc.* v. *Cliffwood Corp.*, 353 Mass. 150, 154 (1967). We construe the contractual arbitration clause as encompassing the parties' contractual dispute. Thus we do not reach the contract claim.

[7] The organization of Medical West follows an arrangement permitted by § 3 of G. L. c. 176G. Under that section, a "carrier" (which is defined in § 1 of the statute to include Blue Cross, certain insurance companies, and nonprofit medical service corporations) may "organize and operate a health maintenance organization as a line of business, division, department, subsidiary or affiliate . . . ."

[8] Medical West is a closed panel staff model HMO. A closed panel HMO provides medical services directly through a salaried staff in one (or more) clinic sites. Physicians, and other specialists, are paid employees of the HMO rather than receiving a fee for their services. See Massachusetts Hospital Association, Report of the Task Force on Health Maintenance Organizations § 8.0 (1), at 8 (March, 1978).

ers to supply certain other services. The specific services which Medical West provides to its members are set out in a document entitled "Evidence of Coverage," issued to all members.

Medical West was first operated as a line of business of Blue Cross, through the Blue Cross HMO division. In 1979, it was incorporated as a separate nonprofit corporation, and the license for the HMO was transferred to it. Blue Cross is the only large investor in Medical West, and pursuant to the by-laws of Medical West, Blue Cross is the sole member of the Medical West Corporation. Blue Cross appoints all of the members of Medical West's board of directors.

Blue Cross is a nonprofit "hospital service corporation" organized under G. L. c. 176A. It is the only corporation in Massachusetts organized and doing business under that statute. Pursuant to c. 176A, Blue Cross for many years has provided a number of group hospital service plans to its subscribers, primarily indemnity plans, coinsurance con- tracts and comprehensive contracts.

In the c. 176A plans, Blue Cross contracts with hospitals to provide services to its members using a standard agree- ment known as the Hospital Reimbursement Agreement (HA-27). That is the only agreement between Blue Cross and any general hospital which has been approved by the Massachusetts Rate Setting Commission pursuant to G. L. c. 176A, § 5, sixth and seventh pars. Each of the plaintiff hospitals had entered into such an agreement with Blue Cross, effective October 1, 1977, to govern reimbursement for services rendered to members of Blue Cross group plans. The agreement, HA-27, predated the establishment of Medical West. Under the terms of the HA-27 agreement, the hospitals are reimbursed by Blue Cross at the rate authorized by G. L. c. 176A, § 5, sixth par. See note 5, *supra*.

When Blue Cross submitted its original application for the Medical West HMO to the Commissioner of Insurance, it included a proposed hospital agreement to cover Medical West's relationship with each of the plaintiff hospitals.

Among its terms was a provision that the plaintiffs be reimbursed at the HA-27 level for care of its HMO members. That document was not submitted to nor approved by the plaintiffs prior to its submission to the Commissioner. When Blue Cross later offered the proposed agreement to each plaintiff, the hospitals would not sign it.

Pending the resolution of this action, the plaintiffs have agreed to accept payments from Blue Cross under HA-27, and have waived any claims to damages in excess of the difference between reimbursement at full charges and reimbursement under HA-27 at the reasonable cost level for Medical West members.[9]

*Statutory construction.* The basic benefit offered by Blue Cross is payment toward hospital charges incurred by a subscriber. Blue Cross pays the hospital directly for these services at the discounted rate authorized by G. L. c. 176A. See note 5, *supra.*[10] Blue Cross c. 176A plans are based on the fee-for-service concept.

In contrast, an HMO member pays a fixed monthly amount for health care. The benefits under an HMO plan include physician services, inpatient and outpatient hospital services, emergency health services, and may include chiropractic services. These benefits are generally greater than those conferred by traditional third party payor health plans. However, an HMO subscriber must receive care only from the persons and institutions that are on the

---

[9] The parties also stipulated that "[f]ollowing the decision of the Supreme Judicial Court on the issues presented in this Stipulation, and in the event that the plaintiffs prevail and seek money damages, all parties may present testimony or other evidence concerning any waiver by or estoppel of the plaintiffs with regard to their claimed rights to reimbursement at the level of full charges for services rendered to members of Medical West."

[10] Certain commercial insurers also provide plans by which their subscribers can purchase hospital services similar to those offered by Blue Cross. Traditionally, a commercial company has not been entitled to pay hospitals the discounted rate paid by Blue Cross. See, e.g., *Travelers Ins. Co.* v. *Blue Cross,* 481 F.2d 80, 82 (3d Cir.), cert. denied, 414 U.S. 1093 (1973).

staff of or have contracted with the HMO if the plan is to pay for the member's health care.[11] See, e.g., note 8, *supra.* Since the HMO's must bear the cost of treating their own members, they are said to have a greater incentive than traditional fee-for-service providers to control the costs of health care.[12] See generally Kissam & Johnson, Health Maintenance Organizations and Federal Law: Toward a Theory of Limited Reformmongering, 29 Vand. L. Rev. 1163, 1163-1165 (1976); Havighurst, Health Maintenance Organizations and the Market for Health Services, 35 L. & Contemp. Prob. 716, 719 (1970).

At the time G. L. c. 176G was enacted, "concern with rising costs of health care and lack of access by many people to quality health care [had] generated increased interest in alternative health care systems throughout this country." *Huff* v. *St. Joseph's Mercy Hosp. of Dubuque Corp.*, 261 N.W.2d 695, 698 (Iowa 1978). The HMO statute was a legislative response to problems of access and cost. In this vein, the statute permits a number of persons, corporations or other entities to establish HMO's. G. L. c. 176G, §§ 1 and 3. It also delegates to the Commissioner of Insurance the power to disapprove HMO rates, and provides that "[n]o [subscriber] contracts shall be approved if the benefits provided therein are unreasonable in relation to the rate charged, nor if the rates are excessive, inadequate or unfairly discriminatory." G. L. c. 176G, § 16. However, there is no regulation in c. 176G, governing an HMO's hospital reimbursement rate. Specifically, the reasonable

---

[11] See Massachusetts Hospital Association, Report of the Task Force on Health Maintenance Organizations § 3.1, at 12 (March, 1978).

[12] Senate Report No. 93-129, accompanying the first comprehensive Federal HMO bill stated that "[i]n recent years, growing attention has been focused on the health maintenance organization (HMO) as an alternative to the traditional fee-for-service, solo practice mode of medical practice. . . . There is substantial evidence which establishes that HMO enrollees receive high quality care at a lower cost — as much as one-fourth to one-third lower than traditional care in some parts of this country." S. Rep. No. 93-129, 93rd Cong., 1st Sess. 1, 2 (1973).

cost limitation of G. L. c. 176A, § 5, sixth par., is not included in G. L. c. 176G. See *supra* at 486 & n.5.

The question is whether c. 176A, or c. 176G, takes precedence when Blue Cross controls and operates an HMO, and simultaneously acts as a carrier for that HMO. Blue Cross claims that, when it functions as a carrier for an HMO, it is entitled to reimburse hospitals at the discounted rate mandated by G. L. c. 176A, § 5, sixth par. We disagree.

The Legislature has exempted HMO's from the provisions of G. L. c. 176A in § 2 of G. L. c. 176G. "[T]he provisions of chapters . . . one hundred and seventy-six A . . . shall not apply to a health maintenance organization." "Words found in a statute are to be given their ordinary lexical meaning unless there be a clear indication to the contrary." *Randall's Case*, 331 Mass. 383, 385 (1954). The legislative command in § 2 is clear and unambiguous: G. L. c. 176A is not applicable to HMO's.

Blue Cross suggests that if the reasonable cost reimbursement requirement of c. 176A, § 5, sixth par., is held not to apply to Blue Cross operated HMO's then Blue Cross would have to be exempted from the other regulatory provisions of c. 176A as well. Were this the case, Blue Cross argues, it and other insurance carriers would be allowed to operate in a total "regulatory lacuna," simply by virtue of operating an HMO. This argument renders nugatory § 2 of G. L. c. 176G. "An intention to enact a barren and ineffective provision is not lightly to be imputed to the Legislature." *Insurance Rating Bd.* v. *Commissioner of Ins.*, 356 Mass. 184, 189 (1969). In effect, as we read § 2, it exempts health care carriers from the statutory provisions which generally regulate them only to the extent that they provide HMO care or coverage, and are therefore governed by G. L. c. 176G.

Blue Cross seeks to find support for its position in cl. 6 of § 3 of c. 176G, which allows insurance carriers, including Blue Cross, to issue jointly "health maintenance contracts" with an HMO. See note 7, *supra*. Blue Cross argues that by issuing such a joint contract, which the statute clearly permits, the HMO members must be treated as Blue Cross

hospital service plan members for reimbursement purposes. Although § 3 allows Blue Cross and other carriers to issue plans under the HMO statute, the question is what reimbursement rate should apply. On that issue, § 3 is silent.[13]

We think that § 2 of c. 176G indicates that the Legislature did not intend to extend to Blue Cross a competitive edge in the HMO field similar to that which Blue Cross enjoys under c. 176A. Blue Cross itself recognizes that there is a need for competition in the health care field. In a letter to the Commissioner of Insurance, it states that "competition between HMOs and the traditional system, and among HMOs, is particularly important as an incentive for cost containment." In its letter, Blue Cross also promises that neither it nor Medical West would engage in anticompetitive practices which act to enhance the market position of Medical West. "In particular," Blue Cross states, "we will not hinder the formation, operation, or expansion of other HMOs . . . ." However, to grant Blue Cross the advantage it seeks for its HMO members by virtue of c. 176A may well have that effect.[14]

---

[13] There may be valid reasons for not requiring comprehensive rate regulatory proceedings for HMO's. The main one is that HMO's are already under pressure to keep premiums down in order to compete with other providers and insurers, and rate regulation, therefore, is not needed and is unnecessarily costly. Other reasons suggested are that without specific standards State regulation may fail to provide adequate funds for capital growth and development; that regulating provider care may jeopardize the quality of care; and that the State insurance departments may be inclined to favor the traditional carriers. See Kissam & Johnson, State HMO Laws and the Theory of Limited Reformmongering, 25 U. Kan. L. Rev. 21, 53, 54 (1976).

[14] At least one independent HMO, Valley Health Plan of Amherst, already operates in the western part of the Commonwealth, and it reimburses the hospitals with which it contracts on the basis of charges. The United States Department of Health, Education and Welfare (now the Department of Health and Human Services) has called for the establishment of additional HMO's in the Springfield area, and the establishment of additional HMO's in western Massachusetts is under consideration. Furthermore, at the time of the stipulation of the parties, a traditional mutual insurance company had filed an application for an HMO in the western part of the State.

Further, "[i]n all grants, made by the government to individuals, of rights, privileges, and franchises, the words are to be taken most strongly against the grantee." *Cleaveland* v. *Norton*, 6 Cush. 380, 383-384 (1850). Construing the exclusive privilege granted Blue Cross most strongly against it favors the plaintiffs' construction of the relevant statutes. We think that if the exclusive privileges granted Blue Cross under G. L. c. 176A are to be extended to c. 176G, that should be done by the Legislature.

Finally, Blue Cross suggests that if it does not prevail, Medical West's premiums may be increased, thereby rendering futile the Legislature's attempt to contain health care costs. The Legislature chose to keep costs down by encouraging competition rather than by extending Blue Cross's exclusive privileges. The choice of means to attain its goals is for the Legislature. We add that, although Medical West's premiums might rise in the short run, the Legislature might well have thought it imprudent to grant further exclusive privileges to the State's largest health insurance carrier.

This case is remanded to the county court for a declaration that the rate of reimbursement to be paid by Blue Cross to the plaintiffs for services rendered to Medical West subscribers is not controlled by G. L. c. 176A, § 5, sixth par.; and for such further proceedings as are necessary.

*So ordered.*