HARVARD COMMUNITY HEALTH PLAN, INC. *vs.* BOARD OF
ASSESSORS OF CAMBRIDGE.

Suffolk.  September 14, 1981. — November 5, 1981.

Present: HENNESSEY, C.J., LIACOS, NOLAN, & LYNCH, JJ.

*Taxation*, Real estate tax: exemption, charity, health maintenance or-
ganization.  *Charity.*

Certain real property owned by the Harvard Community Health Plan,
    Inc., a corporation providing prepaid comprehensive health services
    for about 64,000 subscribers, was exempt from taxation under the
    third clause of G. L. c. 59, § 5, as property of a charitable organi-
    zation.  [541-544]

APPEAL from a decision of the Appellate Tax Board.

*Douglas A. Randall & Christopher S. Pitt* for the defend-
ant.

*Robert K. Gad, III,* for the plaintiff.

LIACOS, J.  The board of assessors of Cambridge (asses-
sors) appeals to this court from a decision of the Appellate
Tax Board (board) which found certain real estate owned
by the Harvard Community Health Plan, Inc. (HCHP), to
be entitled to an exemption under the provisions of G. L.
c. 59, § 5, Third.  The board found that HCHP had sus-
tained its burden under the statute of establishing that it
was incorporated for charitable purposes, and that its oper-
ations on the Cambridge property are consistent with such
purposes.  We conclude that the board's decision is support-
ed by substantial evidence and we affirm.  *New Boston
Garden Corp.* v. *Assessors of Boston,* 383 Mass. 456,
465-466 (1981).

The assessors had denied[1] applications by HCHP for an ex-
emption under G.L. c. 59, § 5, Third, as to property owned

---

[1] Each of the applications in issue was filed timely and was deemed
denied by failure of the assessors to act thereon within three months of the
filing.  G. L. c. 59, §§ 64-65.

and occupied by HCHP at 1603-1611 Cambridge Street, Cambridge. HCHP took three appeals to the board, covering the fiscal years 1975 and 1976, plus six months of 1974. G. L. c. 58A, § 7. The appeals were consolidated for hearing. The board's decision, in favor of HCHP, was issued June 27, 1978. After the thirty-day appeal period provided by Mass. R. A. P. 4, 365 Mass. 846 (1974), had passed, the assessors filed a motion with the board to extend the time for filing a notice of appeal. See Mass. R. A. P. 4. This motion was denied by the board. Relying on the prior decision on the three appeals, HCHP moved for a decision in its favor on two appeals pending for the fiscal years 1977 and 1978. The motion was granted on October 23, 1978. The assessors requested relief from a single justice of this court under Mass. R. A. P. 2, 365 Mass. 845 (1974), and Mass. R. A. P. 14 (b), 365 Mass. 859 (1974). The single justice granted the assessors' motion in an order issued November 27, 1978. The time for filing a notice of appeal was enlarged, and the board was ordered to prepare a report of facts and to pass upon the parties' requests for rulings of law. The decisions in the appeals for 1977 and 1978 were stayed. The present appeal was filed with this court on November 25, 1980.[2] G. L. c. 58A, § 13.

We summarize the board's findings. HCHP was the owner of a building known as the Cambridge Center in each of the three years in question. The Center houses doctors' offices, examination rooms, conference rooms and

---

[2] HCHP urges us to dismiss this appeal on procedural grounds. It argues that the proper course in the face of the denial by the board of a motion under Mass. R. A. P. 4, 365 Mass. 846 (1974), is to appeal the denial to this court. However, Mass. R. A. P. 14 (b), 365 Mass. 859 (1974), authorizes a single justice of this court to enlarge the time for filing a notice of appeal beyond the thirty-day limit of Mass. R. A. P. 4. In addition, Mass. R. A. P. 2, 365 Mass. 845 (1974), provides the single justice with broad power to suspend the requirements of any rule of appellate procedure. The order of the single justice was entirely within his sound discretion and authority, and we need not decide whether the limitation of relief under Mass. R. A. P. 4 to cases of "excusable neglect" is to be read into the "good cause" standard of Mass. R. A. P. 14 (b).

laboratories, a medical records library, cafeteria, administrative offices, and meeting rooms.  In short, the premises are a full-service clinic and are occupied by the officers and employees of HCHP for the purpose of providing prepaid comprehensive health services for a subscribing population. HCHP was organized in 1969 as a corporation for charitable purposes under G. L. c. 180.[3]  Its stated primary purposes are to join with "the Medical School of Harvard University and its affiliated teaching hospitals . . . to advance the development of comprehensive health care and to promote medical education by formulating a program or programs of prepaid comprehensive health services for a subscribing population which will:  (a) Attempt to create effective and economic means of organizing and delivering health care; (b) Provide the students, faculties, and staffs of the Medical Institutions with an opportunity for studying and teaching comprehensive health care; and (c) Conduct social and clinical research concerning health needs and the effectiveness of health care."  In furtherance of these purposes, HCHP proposed, among other things, to:  provide patient care; engage in teaching and research; establish, operate and maintain medical service centers, clinics and such other facilities as may aid in the study, prevention, diagnosis, care or treatment of ailments and injuries.

The doctors using the facilities are full-time or part-time employees of HCHP.  With rare exception, the only patients examined or treated on the premises are enrollees of the plan.  None of the full-time physicians are members or directors of the corporation, nor do they receive anything of value from the corporation but their salaries, which are comparable to or below those earned by physicians in private practice.

---

[3] HCHP has also been granted exemption from Federal taxation as a charitable organization, pursuant to § 501(c)(3) of the Internal Revenue Code of 1954, as amended.  The requirements for exemption under I.R.C. § 501(c)(3) are virtually identical to those under G. L. c. 59, § 5, Third.  See White, Tax Policy and Health Maintenance Organizations: The Case for a Section 501(c)(3) Tax Exemption, 6 Am. J.L. & Med. 283, 286-287, 294 & n.75 (1980).

384 Mass. 536        539

Harvard Community Health Plan, Inc. v. Board of Assessors of Cambridge.

During the period in question, three members of the board of directors received money from HCHP.[4] The board determined that these payments represented reasonable compensation for the services rendered. Otherwise, no member or director received any money or property from HCHP.

As of the time of the hearing, the plan served approximately 64,000 enrollees, most of whom resided in the greater Boston area. The majority were electing employees of about 1,700 employers, in addition to approximately 5,800 State and municipal employees. More than 3,000 persons were enrolled through State or Federal health care programs.[5] HCHP provides health services in a broader range and at a lower cost than traditional health insurance coverage through an insurance plan such as Blue Cross/Blue Shield.

The Cambridge Center also operates as a clinical training center, through residency programs for medical students and doctors intending to become "primary care physicians" (the modern-day successor to the general practitioner), and specialists in internal medicine. These programs are operated according to standards developed for formal teaching hospitals by the American Medical Association.[6] The board found that "the activities conducted by [HCHP] at the subject premises may be described as a hospital operation."

---

[4] One of the three is also executive director of the plan and received his salary. Another is an attorney whose firm represents HCHP. The third is a consultant on organizational matters.

[5] The board designated HCHP's public assistance contracts as charitable, in the traditional, "almsgiving" sense. Such a finding, though not necessary, see 543, infra, was based on the fact that the amount charged for this care was equal to that charged for other enrollees. This was so despite the fact that publicly-assisted persons require more extensive health care than other enrollees.

[6] The board also found that HCHP participates in research programs under various grants. The indications from the evidence are that such research was either done at other HCHP facilities or was not done during the relevant time periods. Our decision does not rely to any great extent on medical research performed at the Cambridge Center, and the presence or absence of such work is therefore not significant in this case.

These findings were, among others, the basis of the board's decision that the property in issue was exempt under G. L. c. 59, § 5, Third.[7]

The assessors argue that the decision of the board is unsupported by the evidence of record and erroneous as matter of law. Although there is no finding that HCHP is a health maintenance organization (HMO) under G. L. c. 176G, many of the findings of the board as to the nature of HCHP indicate that it operates in a fashion comparable to an HMO. The HMO is a relatively new phenomenon. See *Baystate Medical Center* v. *Blue Cross of Mass., Inc.*, 382 Mass. 485 (1981).[8] So, too, HCHP reflects recent developments in the delivery of health care services. We have recognized that an HMO is "an entity which provides a full range of health care benefits to voluntarily enrolled members either directly or by contractual agreements. Enrolled members purchase the services of an HMO for a prepaid or aggregate fixed sum." *Id.* at 485 n.2. At the same time, we noted the "evidence which establishes that HMO enrollees receive high quality care at a lower cost — as much as one-fourth to one-third lower than traditional care in some parts of this country." *Id.* at 490 n.12, quoting from S. Rep. No. 93-129, 93rd Cong., 1st Sess. 1, 2 (1973).

The board has made similar findings as to HCHP. Our affirmation of the board's decision is not based solely on the delivery by HCHP of high-quality medical care at a lower cost than is charged by conventional health care systems. Although laudable, such benefits, conferred by most HMO's

---

[7] General Laws c. 59, § 5, as amended through St. 1970, c. 219, provides in relevant part: "The following property shall be exempt from taxation . . .: Third, Personal property of a charitable organization, which term, as used in this clause, shall mean (1) a literary, benevolent, charitable or scientific institution or temperance society incorporated in the commonwealth, . . . and real estate owned by or held in trust for a charitable organization and occupied by it or its officers for the purposes for which it is organized."

[8] General Laws c. 176G, inserted by St. 1976, c. 454, § 1, which defines health maintenance organizations in the Commonwealth, was not in effect during the relevant time periods.

or by HCHP on their enrollees, are not alone sufficient for entitlement to exemption as a charitable organization.

The third clause of G. L. c. 59, § 5, exempts from taxation property of a "charitable organization," defined as "a literary, benevolent, charitable or scientific institution . . . incorporated in the commonwealth." Exemption is extended to the real property of a corporation with charitable purposes, provided it is occupied by the corporation for such purposes. See *Meadowbrooke Day Care Center, Inc.* v. *Assessors of Lowell,* 374 Mass. 509, 511 (1978); *Milton Hosp. & Convalescent Home* v. *Assessors of Milton,* 360 Mass. 63, 67 (1971). See also *Massachusetts Medical Soc'y* v. *Assessors of Boston,* 340 Mass. 327, 332 (1960). Thus, at the very least, the taxpayer must be a charitable organization in order for its property to qualify for exemption. This would deny exemption to those group practices which are nevertheless engaged in the practice of medicine for profit. See *Milton Hosp., supra* at 69. In addition, subpart (*a*) of the third clause of § 5 provides that exemption is not available even to ostensibly charitable organizations if "any of the income or profits of the business of the charitable organization is divided among the . . . members [of the corporation], or is used . . . for other than . . . charitable . . . purposes." This prohibition against inurement to "insiders" will preclude exemption for the property of a group medical practice or clinic where, for example, the physicians "employed" by it serve on its board or otherwise exert control over its finances. See *Fisher School* v. *Assessors of Boston,* 325 Mass. 529, 535 (1950); White, Tax Policy and Health Maintenance Organizations: The Case for a Section 501(c)(3) Tax Exemption, 6 Am. J.L. & Med. 283, 301-303 (1980). See also 4 A. Scott, Trusts § 372.1 (3d ed. 1967) ("if the payment of salaries is a mere device for securing to the beneficial owners the profits which may accrue, the institution is not charitable").

The record shows that no such inurements or commercial purposes exist in the HCHP. The assessors concede in their brief that "[t]here is no question that the purposes of HCHP

as stated in its Articles of Organization . . . are largely charitable in nature." The assessors specifically enumerate the promotion of health, education, and medical research as charitable purposes. Without a later qualification by the assessors, see *infra,* such a concession would be dispositive, since it is clear from the board's findings that the activities of the center are "quite in keeping with the corporation's stated charitable purposes." *Meadowbrooke Day Care Center, Inc. v. Assessors of Lowell, supra* at 512.

The assessors argue, however, that because the dominant activity carried on at the Center is the delivery of prepaid medical services to its enrollees, the plan benefits an insufficient number of persons to qualify as charitable in operation. See *Massachusetts Medical Soc'y, supra.* They liken HCHP to nonprofit mutual benefit societies, which have in the past been denied exemption. See *Assessors of Boston* v. *Boston Pilots' Relief Soc'y,* 311 Mass. 232 (1942); *Young Men's Protestant Temperance & Benevolent Soc'y* v. *Fall River,* 160 Mass. 409 (1894).[9] We cannot accept these characterizations.

As would be the case with any nontraditional operation, we make our determination aware that exemption from taxation "is a matter of special favor" and "the more remote the objects and methods become from the traditionally recognized objects and methods the more care must be taken to preserve sound principles and to avoid unwarranted exemptions from the burdens of government." *Boston Chamber of Commerce* v. *Assessors of Boston,* 315 Mass. 712, 716, 718 (1944).

However, we recognize too that major changes in the area of health care, especially in modes of operation and

---

[9] The assumption implicit in the assessors' argument is that, because of its prepayment feature, HCHP resembles a mutual insurance (or hospital service) corporation, of a type which has been held not to be tax exempt as a charitable organization. See *Hassett* v. *Associated Hosp. Serv. Corp.,* 125 F.2d 611 (1st Cir.), cert. denied, 316 U.S. 672 (1942); but cf. Annot., 88 A.L.R.2d 1414 (1963) (tax exemptions of Blue Cross/Blue Shield, or other medical service corporations).

financing, have necessitated changes as well in definitional predicates. The term "charitable," as applied to health care facilities, has been broadened since earlier times, when it was limited mainly to almshouses for the poor. As a result, the promotion of health, whether through the provision of health care or through medical education and research, is today generally seen as a charitable purpose. A. Scott, *supra* at §§ 368, 372; G.T. Bogert, Trusts & Trustees § 374 (rev. 2d ed. 1977). Such a purpose is separate and distinct from the relief of poverty, and no health organization need engage in "almsgiving" in order to qualify for exemption. See *Barrett* v. *Brooks Hosp., Inc.*, 338 Mass. 754, 759 (1959); A. Scott, *supra* at 2895-2896. See also *Eastern Ky. Welfare Rights Organization* v. *Simon*, 506 F.2d 1278, 1287-1289 (D.C. Cir. 1974), vacated on other grounds, 426 U.S. 26, 46 (1976); *Sound Health Ass'n* v. *Commissioner*, 71 T.C. 158, 177-179 (1978).[10]

Absent proscribed inurements or commercial purpose, see G. L. c. 59, § 5, Third, an institution having as its dominant purpose the promotion of health may be granted exemption if the persons who are to benefit are of a sufficiently large or indefinite class so that the community is benefited by its operations. See *Children's Hosp. Medical Center* v. *Assessors of Boston*, 353 Mass. 35, 44 (1967); *Assessors of Boston* v. *Garland School of Home Making*, 296 Mass. 378, 388-389 (1937); A. Scott, *supra* at 2897-2898.

We are not called upon in this case to set a precise figure at which a charitable organization will be deemed to serve a large enough segment of the population. We reaffirm the well-established rule that a party claiming exemption bears a grave burden of proving the claim. See *Meadowbrooke Day Care Center, Inc.* v. *Assessors of Lowell, supra* at 513. Where the record shows that an institution, even one dedicated to the promotion of health, is operated primarily for

---

[10] It follows too that the charging of fees for services does not detract from charitable status. *Children's Hosp. Medical Center* v. *Assessors of Boston*, 353 Mass. 35, 41 (1967).

"the betterment of a particular limited group of persons," denial of exemption will be most proper. *Massachusetts Medical Soc'y, supra.* Cf. *Baltimore Regional Joint Bd. Health & Welfare Fund* v. *Commissioner,* 69 T.C. 554 (1978) (cooperative offering limited prepaid medical care denied § 501[c][3] status because membership restricted to particular union).

The test has been stated as follows: "An institution will be classed as charitable if the dominant purpose of its work is for the public good and the work done for its members is but the means adopted for this purpose. But if the dominant purpose of its work is to benefit its members or a limited class of persons it will not be so classed, even though the public will derive an incidental benefit from such work." *Massachusetts Medical Soc'y, supra* at 332, and authorities cited. We are of the opinion that HCHP has met these requirements. The record shows that the Cambridge Center provides substantial medical services, at a lower than average cost, to a large number of persons who are drawn from all walks of life in the greater Boston area. The class of persons potentially benefited by this organization is not so small that the promotion of its health is of no benefit to the community at large. See *Sound Health Ass'n* v. *Commissioner, supra* at 185.

> *Decision of the Appellate*
> *Tax Board affirmed.*