96                        434 Mass. 96 (2001)

Western Massachusetts Lifecare Corporation *v.* Board of Assessors of Springfield.

## Western Massachusetts Lifecare Corporation *vs.* Board of Assessors of Springfield.

Suffolk. November 6, 2000. - May 11, 2001.

Present: Marshall, C.J., Greaney, Ireland, Spina, & Sosman, JJ.

*Taxation*, Real estate tax: abatement, charity, exemption, value. *Charity. Value.*

A charitable corporation formed exclusively to provide housing, nursing care, and other related services designed to meet the special needs of the elderly to enable them to maintain their independence, that was not, in light of its entrance requirements, available to a sufficiently large segment of the population to qualify as a charity and did not lessen the burdens of government in any appreciable way, failed to demonstrate that it was entitled to a charitable exemption pursuant to G. L. c. 59, § 5, Third. [101-106]

On an appeal from a refusal of the assessors of a city to grant a property tax abatement, where the Appellate Tax Board found that one of the taxpayer's expert witnesses was not qualified to value the subject real property and the other had withdrawn his opinion, it was proper for the board to conclude that the taxpayer had not carried its burden of establishing that the assessment had overvalued the property [106-107]; furthermore, where the assessors had moved to dismiss on the ground that the taxpayer had not sustained its burden of proof, there was nothing improper in the board's engaging in any "weighing" of the expert testimony [107-108].

Appeal from a decision of the Appellate Tax Board.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*John M. Lynch* (*Stephen W. DeCourcey* with him) for the defendant.

*Jeffrey P. Allen* for the plaintiff.

The following submitted briefs for amici curiae:

*M. Robert Dushman, Jeffrey M. Sacks, Elissa M. McMillen & Stephanie M. Taverna* for Rogerson Communities & others.

*James F. Sullivan, Jennifer Dopazo & Thomas J. Urbelis* for Massachusetts Association of Assessing Officers & others.

*Martin J. Newhouse & Elaine J. Goldenberg* for The Cambridge Homes, Inc., & others.

SOSMAN, J. Western Massachusetts Lifecare Corporation (Western) has appealed from a decision of the Appellate Tax Board (board) rejecting Western's request for a property tax abatement. Western claims that it is entitled to a charitable exemption pursuant to G. L. c. 59, § 5, Third. If not exempt, Western further claims that the assessment by the board of assessors of Springfield (assessors) overvalued the property. We transferred its appeal to this court on our own motion. We agree with the board that Western is not entitled to the charitable exemption of G. L. c. 59, § 5, Third, and that Western has not carried its burden of establishing overvaluation. We therefore affirm the board's decision.

1. *Facts*. Western's claim of charitable exemption was submitted to the board on a statement of agreed facts, which we now summarize. Western is a corporation organized pursuant to G. L. c. 180. Since 1993, Western has been exempt from Federal income tax as an organization classified under § 501(c)(3) of the Internal Revenue Code. As set forth in its articles of organization, Western was formed "exclusively for charitable purposes and, in furtherance thereof, to provide housing, nursing care, social and recreational services and other related services designed to meet the special needs of the elderly in order to enable them to maintain their independence."

In 1990, Western entered into a long-term ground lease for the property at 807 Wilbraham Road, a site belonging to Springfield College, which is also a nonprofit corporation organized under G. L. c. 180. Under the lease, Western is responsible for all real estate taxes.

Western constructed a continuing care retirement community on the Wilbraham Road property, which operates under the name "Reeds Landing." Reeds Landing opened for occupancy in September, 1995. The facility provides housing and services to elderly residents in 117 "independent living units" (ILUs), fifty-four "assisted living units" (ALUs), and a forty-bed skilled nursing facility. Common facilities include formal and informal dining rooms, recreation rooms, lounges, library, beauty and

barber shop, convenience store, coffee shop, and gift shop.[1] In its promotional materials, Western describes Reeds Landing as a "luxury residential complex" offering a "safety net" of services and support for the elderly.

The 117 ILUs at Reeds Landing comprise forty-four per cent of the total space at the complex. The units vary from one-bedroom apartments to two-bedroom cottages with a den, deck, and garage. The layout of the ILUs is intended to accommodate the decreased sensory acuity and mobility of aging persons, enabling them to maintain an essentially independent life style. Services available to ILU residents include fifteen to thirty meals a month, biweekly light housekeeping, weekly linen and towel service, trash removal, unit and grounds maintenance, local scheduled transportation, assistance filling out insurance forms, arranging for inpatient hospital care, and exercise programs.

Western does not provide health care to residents of the ILUs. Residents may visit the Wellness Center clinic for routine examinations and minor health problems, but that clinic is independently owned and operated and charges its own separate fees. Residents may also arrange for private medical care to be provided in their individual units. Residents are required to apply for Medicare insurance benefits and to maintain supplemental health insurance satisfactory to Reeds Landing management. Residency in the ILU includes the "LifeCare Benefit," which grants ILU residents the right to transfer to an assisted living unit or to the skilled nursing facility if such a transfer becomes necessary. If skilled nursing is needed on a temporary basis, residents of ILUs may also stay briefly in the skilled nursing facility and then move back to their own units.

Applicants seeking admission to an ILU at Reeds Landing must be at least sixty-five years old (or the spouse of a person at least sixty-five years old), must satisfy the resident review committee (consisting of three Western board members) that

---

[1]Springfield Institution for Savings operates a banking office at Reeds Landing for the convenience of residents and Western employees. There is also a medical clinic (Wellness Center) operated by an independent provider that sets its own fees. The parties agree that the premises occupied by these two for-profit enterprises would not qualify for any charitable exemption.

they are healthy and capable of caring for themselves, and must demonstrate that they have the financial ability to pay both the entrance fees and the monthly service fees.

The initial entrance fees for ILUs range from $100,200 (for the smallest one-bedroom apartment) to $230,500 (for a two-bedroom unit with den and balcony). These fees are partially refundable when a resident vacates Reeds Landing, with the refund amount declining by one per cent for each month of residence. An applicant can opt for a guaranteed refund of eighty-five per cent, but that option increases the initial entry fees to a range of $128,200 (for the one-bedroom unit) to $290,200 (for the largest unit). All entrance fees are increased by $15,000 if a second occupant will reside in the unit. The monthly service fees range from $1,325 (for the smallest unit) to $2,050 (for the largest unit), plus an additional $475 a month for any second occupant.[2]

Applicants must demonstrate that they have sufficient assets with which to pay the entrance fee and that, from remaining assets, they will have sufficient stable income to meet the ongoing monthly service fees. In order to qualify, an applicant's monthly income must be at least one and one-half to two times the monthly service fee. If the applicant's income is less than one and one-half times the monthly fee, admission will be denied unless the applicant demonstrates adequate assets sufficient to cover all projected costs or provides a guarantee of payment from a person or organization of proven means. While Reeds Landing has a policy of not displacing a resident solely because the resident later becomes unable to pay the fees, the financial screening criteria are such that, to date, no resident has been unable to meet the monthly fees.

There are fifty-four ALUs at Reeds Landing. The ALUs are designed for elderly persons who require some assistance with normal daily activities, such as bathing, dressing, and taking medications. Certain of the ALUs are designed for persons with impaired memory, providing specialized security and safety features for such residents.

Residents transferring from an ILU to an ALU pay a slightly

___

[2]In its agreements with residents, Western reserves the right to adjust the monthly fees "on the basis of its experience" or to reflect changes in costs.

increased monthly fee (reflecting the increased number of meals provided), but are not charged any further entry fee for that transfer. Persons seeking initial entry into a Reeds Landing ALU must demonstrate acceptable health, and must have the financial means to pay the ALU entrance fees and monthly charges. If a new ALU resident contracts for the LifeCare Benefit (that guarantees access to the skilled nursing facility at no additional charge), the entrance fee is $75,000, and the monthly service fees range from $2,200 to $2,800. Applicants may also enter an ALU without the LifeCare Benefit and avoid all entrance fees, but the monthly fees for such ALU residents are higher ($2,700 to $2,800). Monthly fees for residents in the ALUs adapted for the memory impaired range from $3,250 to $3,500. The same measurements are used to determine whether an ALU applicant meets Reeds Landing's financial criteria (i.e., sufficient assets to pay the entrance fee and a stable monthly income of at least one and one-half to two times the monthly service fees).

The skilled nursing facility (SNF) is a forty-bed long-term care facility providing nursing care to residents twenty-four hours a day. SNF residents have all of their meals provided for them, and many require assistance with feeding. They also receive their medication from a licensed nurse. Residents of the ILU and those in the ALU with the LifeCare Benefit are entitled to transfer to the SNF if such a transfer becomes necessary. Former ILU residents pay their regular monthly fees with an increase for the additional meals provided. Former ALU residents who opted for the LifeCare Benefit pay the same monthly fee they were charged in their ALUs.

To the extent beds are available, members of the general public may use the SNF on a per diem basis.[3] Western is a party to a Medicare provider agreement for the SNF and may not deny admission to the SNF based on source of payment. However, with residents of 117 ILUs (plus those ALU residents who opted for the LifeCare Benefit) all guaranteed access to the same forty-bed nursing home facility, the board inferred that access to the SNF was, as a practical matter, only available to

[3]Charges are $165 a day for a semi-private room and $185 per day for a private room.

those who had entered Reeds Landing by way of an ILU or an ALU (and thus had already paid substantial entry fees). There was no evidence that anyone who had not been a resident of an ILU or ALU had ever been admitted to the SNF.

On January 30, 1998, Western applied to the assessors for an abatement of its property taxes, claiming that it was entitled to a statutory exemption for the Reeds Landing property or, in the alternative, that the property had been overvalued. The application was denied and Western filed a timely appeal with the board. The board bifurcated the appeal, considering first the claim of exemption (which was submitted on a statement of agreed facts), and then hearing evidence on the issue of overvaluation. After Western presented its evidence of value, the assessors moved for a directed verdict. On November 25, 1998, the board issued its decision, ruling that Western was not entitled to the charitable exemption and that Western had failed to meet its burden on the claimed overvaluation. At Western's request, the board then issued findings of fact and a report. The present appeal followed.

2. *Charitable exemption under G. L. c. 59, § 5, Third.* Western contends that, based on the agreed facts, it is entitled to an exemption from taxation on the property at Reeds Landing and that the board therefore erred as a matter of law in denying that exemption. Real estate owned by a "charitable organization" and occupied by another charitable organization "for the purposes of such other charitable organization" is exempt from taxation under G. L. c. 59, § 5, Third. The term "charitable organization" is defined as "a literary, benevolent, charitable or scientific institution or temperance society incorporated in the commonwealth." *Id.* However, "[i]f any of the income or profits of the business of the charitable organization . . . is used or appropriated for other than literary, benevolent, charitable, scientific or temperance purposes," the property shall not be exempt. *Id.*

The burden of establishing entitlement to the charitable exemption lies with the taxpayer. *New England Legal Found.* v. *Boston*, 423 Mass. 602, 609 (1996). "Any doubt must operate against the one claiming tax exemption, because the burden of proof is upon the one claiming an exemption from taxation to

show clearly and unequivocally that he comes within the terms of the exemption." *Boston Symphony Orchestra, Inc.* v. *Assessors of Boston*, 294 Mass. 248, 257 (1936). "Exemption from taxation is a matter of special favor or grace. It will be recognized only where the property falls clearly and unmistakably within the express words of a legislative command." *Massachusetts Med. Soc'y* v. *Assessors of Boston*, 340 Mass. 327, 331 (1960), quoting *Boston Chamber of Commerce* v. *Assessors of Boston*, 315 Mass. 712, 716 (1944). See *Springfield Young Men's Christian Ass'n* v. *Assessors of Springfield*, 284 Mass. 1, 5 (1933) ("Exemption from taxation is to be strictly construed and must be made to appear clearly before it can be allowed").

The mere fact that the organization claiming exemption has been organized as a charitable corporation does not automatically mean that it is entitled to an exemption for its property. See *American Inst. for Economic Research* v. *Assessors of Great Barrington*, 324 Mass. 509, 513 (1949); *Brockton Knights of Columbus Bldg. Ass'n, Inc.* v. *Assessors of Brockton*, 321 Mass. 110, 113-114 (1947). Rather, the organization "must prove that it is in fact so conducted that in actual operation it is a public charity." *Jacob's Pillow Dance Festival, Inc.* v. *Assessors of Becket*, 320 Mass. 311, 313 (1946). See *Cummington Sch. of the Arts, Inc.* v. *Assessors of Cummington*, 373 Mass. 597, 599 (1977); *Massachusetts Med. Soc'y* v. *Assessors of Boston, supra* at 332. See also *H-C Health Servs., Inc.* v. *Assessors of S. Hadley*, 42 Mass. App. Ct. 596, 599 (1997) (that corporation not organized under G. L. c. 180 did not preclude charitable exemption because critical issue was "how the organization describes itself, and what in fact it does").

"A charity, in the legal sense, may be more fully defined as a gift, to be applied consistently with existing laws, for the benefit of an indefinite number of persons, either by bringing their minds or hearts under the influence of education or religion, by relieving their bodies from disease, suffering or constraint, by assisting them to establish themselves in life, or by erecting or maintaining public buildings or works or otherwise lessening the burdens of government." *Boston Chamber of Commerce* v. *Assessors of Boston, supra* at 716, quoting *Jackson* v. *Phillips*, 14 Allen 539, 556 (1867). "An institution will be classed as

charitable if the dominant purpose of its work is for the public good and the work done for its members is but the means adopted for this purpose. But if the dominant purpose of its work is to benefit its members or a limited class of persons it will not be so classed, even though the public will derive an incidental benefit from such work." *New England Legal Found. v. Boston, supra* at 609-610, quoting *Massachusetts Med. Soc'y v. Assessors of Boston, supra* at 332. While the potential list of activities that may qualify as charitable in nature is very broad, "the more remote the objects and methods [of expressing charity] become from the traditionally recognized objects and methods the more care must be taken to preserve sound principles and to avoid unwarranted exemptions from the burdens of government." *Boston Chamber of Commerce v. Assessors of Boston, supra* at 718. Thus, although many activities and services are commendable, laudable and socially useful, they do not necessarily come within the definition of "charitable" for purposes of the exemption. See *id.* (denying exemption to chamber of commerce "[a]lthough no doubt its work is highly commendable and of great public benefit . . ."); *Massachusetts Med. Soc'y v. Assessors of Boston, supra* at 333 (denying exemption to professional association despite "most laudable" goal of improving medical profession).

Western contends that Reeds Landing serves a charitable purpose, namely, the provision of housing and health care to the elderly in a setting that offers them independence, dignity, and security. The provision of health care has been recognized as a traditional charitable purpose, see *Harvard Community Health Plan, Inc. v. Assessors of Cambridge,* 384 Mass. 536, 543 (1981), as has the provision of nursing home care for the elderly, see *H-C Health Servs., Inc. v. Assessors of S. Hadley, supra.* The board has also recognized as charitable the provision of housing, personal assistance, and supervision to meet the special needs of elderly persons. See *Island Elderly Hous., Inc. v. Assessors of Tisbury,* 20 Mass. App. Tax Bd. Rep. 232 (1997).

However, the operation of Reeds Landing fails a critical component of our tests for charitable exemption from property taxes, namely, that the persons who are to benefit must be "of a sufficiently large or indefinite class so that the community is

benefited by its operations." *Harvard Community Health Plan, Inc.* v. *Assessors of Cambridge, supra.* An organization "operated primarily for the benefit of a limited class of persons," such that "the public at large benefit[s] only incidentally from [its] activities," is not charitable. *Cummington Sch. of the Arts, Inc.* v. *Assessors of Cummington, supra* at 600. While there is no "precise number" of persons who must be served in order for an organization to claim charitable status, and "at any given moment an organization may serve only a relatively small number of persons," membership in the class served must be "fluid" and must be "drawn from a large segment of society or all walks of life." *New England Legal Found.* v. *Boston, supra* at 612. Thus, selection requirements, financial or otherwise, that limit the potential beneficiaries of a purported charity will defeat the claim for exemption. See *Boston Symphony Orchestra, Inc.* v. *Assessors of Boston, supra* at 255-256 (where substantial admission fees and practice of giving preferences to season ticket holders meant that educational benefits of concerts were not available to large segment of the public, charitable exemption was properly denied).

The benefits of Reeds Landing are limited to those who pass its stringent health and financial requirements, requirements that make most of the elderly population ineligible for admission. The class of elderly persons who can pay an entrance fee of $100,000 to $300,000 and have, from their remaining assets, monthly income of $2,000 to $7,000 is a limited one, not a class that has been "drawn from a large segment of society or all walks of life." *New England Legal Found.* v. *Boston, supra.*

An organization does not necessarily have to serve the poor or the needy in order to qualify for the charitable exemption. See *id.* at 609; *Harvard Community Health Plan, Inc.* v. *Assessors of Cambridge, supra* at 543; *Massachusetts Med. Soc'y* v. *Assessors of Boston, supra* at 331. Similarly, the fact that an organization charges fees for its services does not preclude a determination that the organization is charitable. See *Assessors of Boston* v. *Garland Sch. of Home Making,* 296 Mass. 378, 389 (1937); *New England Sanitarium* v. *Stoneham,* 205 Mass. 335, 342 (1910). Thus, the fact that Reeds Landing is not expressly designed to meet the needs of the indigent, and the

fact that its fees are substantial, would not automatically defeat the claim for exemption. However, the organization's services must still be accessible to a sufficiently large and indefinite class of beneficiaries in order to be treated as a charitable organization. An organization that has expressly limited its services to those who are financially well off does not meet this test. See *New England Sanitarium* v. *Stoneham, supra* at 341 ("a trust for the exclusive benefit of the least wealthy of a well to do or prosperous class could not be sustained as a charity"). See also *Boston Symphony Orchestra, Inc.* v. *Assessors of Boston, supra* at 256 (high price of tickets "makes it doubtful whether the benefits are extended to the poor as well as to the rich"). Cf. *Assessors of Boston* v. *Garland Sch. of Home Making, supra* at 389, 390 (although "[i]t may be . . . that an educational institution exclusively for the benefit of the rich is not a public charity," school's exemption was sustainable where "[t]here well might be a large number of persons, many of whom would not ordinarily be regarded as rich, who would wish to avail themselves of the benefits of [the school] upon the [price] prescribed").

Reeds Landing is not, in light of its entrance requirements, available to a sufficiently large segment of the population to qualify as a charity under our case law. Rather, it provides a very valuable service to persons whose income and assets are sufficient to show, at the time of entry, that they will in all likelihood be able to afford a "luxury" residence for the remaining years of their lives. This form of addressing the needs of the elderly, however much it may benefit those fortunate enough to qualify for it, is indeed "remote" from our traditional concept of charity. *Boston Chamber of Commerce* v. *Assessors of Boston, supra* at 718.

Another factor to be considered in determining whether an organization in fact operates as a public charity is whether the operation of the program or institution "lessen[s] any burden government would be under any obligation to assume." *Id.* at 717. The fact that an organization provides some service that would, in its absence, have to be provided by the government "is frequently put forward as the fundamental reason for exempting charities from taxation." *Id.* See *Assessors of Quincy*

v. *Cunningham Found.*, 305 Mass. 411, 418 (1940); *Boston Symphony Orchestra, Inc.* v. *Assessors of Boston, supra* at 256. Reeds Landing does not lessen the burdens of government in any appreciable way. The vast majority of its residents enjoy sufficient good health to live independently (a prerequisite for admission to an ILU), all of its residents must have significant assets and income with which to meet the Reeds Landing fee schedule, and all of its residents must maintain adequate health insurance. This is not a population that, but for the operation of Reeds Landing, would be requiring governmental assistance with housing or health care.

Where Western did not meet its burden of proving "clearly and unequivocally" that it was entitled to the charitable exemption, the board committed no error in denying the exemption. *Boston Symphony Orchestra, Inc.* v. *Assessors of Boston, supra* at 257.

3. *Valuation.* In the alternative, Western contends that the property is overvalued and that the board erred in upholding the assessors' valuation. The taxpayer bears the burden of showing the property is overvalued, and the board may presume the validity of the valuation unless the taxpayer has sustained the burden of proving the contrary. See *Schlaiker* v. *Assessors of Great Barrington*, 365 Mass. 243, 245 (1974), and cases cited.

Western's first proffered valuation expert expressed an opinion of value during his direct examination, but, during cross-examination, withdrew that opinion. After being confronted with various flaws in his analysis, the proffered expert acknowledged that he was not qualified to render any opinion.[4] Western could not meet its burden of proof by reference to an opinion that was withdrawn by the expert.

Western then called another witness whose expertise was in operation and management of long-term care facilities, such as nursing homes. Based on his experience and training, he could assess the value of a long-term care enterprise. However, he had

---

[4]Despite this unambiguous withdrawal of the opinion, Western now argues that the original opinion is somehow still in evidence and that the board erred in refusing to consider it. The argument is specious. The witness not only withdrew the opinion, but disclaimed his own qualifications and left the hearing prior to the completion of his cross-examination.

no training or experience in real estate or real estate valuation, and no experience in the sale of real estate. On that basis, the assessors objected to the witness's qualifications, arguing that he was not qualified to express an opinion on the value of the property. The board reserved ruling on the issue of the witness's qualifications, expressly stating that it would hear the witness's opinions de bene. As previewed in the battle over the witness's qualifications, the witness went on to express an opinion as to what he would be willing to pay, or what he would recommend that a client pay, for the Reeds Landing enterprise, not an opinion of the value of the real estate. At the conclusion of the testimony, the assessors moved to strike the opinion, and the board took that motion under advisement. At the conclusion of Western's presentation of evidence, the city moved to dismiss on the ground that Western had not sustained its burden of proof.

In its findings of fact and report, the board ultimately ruled that the health care expert "was not qualified to value the subject real property." With the first witness's opinion of value having been withdrawn and the second witness not qualified to render an opinion on the relevant issue, the board correctly ruled that Western had not sustained its burden of proof with respect to overvaluation.

However, citing to another reference in the board's ruling to the effect that it had given the health care expert's opinion "little weight," Western argues that the board erroneously engaged in weighing the evidence and assessing credibility on a motion to dismiss. Western's argument is unavailing. The board's conclusion that the witness was "not qualified" to value the property is unambiguous (and well supported). Where the entirety of the witness's testimony had only been taken de bene, reserving ruling on whether the witness was qualified, the later decision that the witness was not qualified effectively struck the witness's testimony. Moreover, where the board itself is the finder of fact, we have noted that a motion to dismiss at the close of the taxpayer's case is akin to a motion under Mass. R. Civ. P. 41 (b) (2), 365 Mass. 803 (1974). See *General Elec. Co.* v. *Assessors of Lynn,* 393 Mass. 591, 599 n.3 (1984). On such a motion, the board may engage in weighing the evidence to

determine whether the party bearing the burden of proof has met that burden. "In granting a motion to dismiss at the close of evidence in a nonjury trial, a judge is entitled to 'weigh the evidence and resolve all questions of credibility, ambiguity, and contradiction in reaching a decision.' " *Delano Growers' Coop. Winery* v. *Supreme Wine Co.*, 393 Mass. 666, 676 (1985), quoting *Ryan, Elliott & Co.* v. *Leggat, McCall & Werner, Inc.*, 8 Mass. App. Ct. 686, 689 (1979). To the extent, if any, that the board engaged in any "weighing" of the expert testimony, there was nothing improper in such weighing.

*Decision of the Appellate Tax*
*Board affirmed.*