## Jewish Geriatric Services, Inc., & others[1] *vs.* Board of Assessors of Longmeadow.

No. 02-P-1144.

Suffolk. December 4, 2003. - April 30, 2004.

Present: Lenk, Kafker, & Mills, JJ.

*Taxation,* Appellate Tax Board: appeal to Appeals Court; Abatement; Exemption; Real estate tax: abatement; charity; classification of property.

This court concluded that the evidence in a proceeding for abatement of property taxes imposed by a town's board of assessors supported the conclusion of the Appellate Tax Board that an assisted living facility which the taxpayers were involved in operating served only a financially independent segment of the population, and thus did not qualify for a property tax exemption for entities serving a charitable purpose under G. L. c. 59, § 5, Third, particularly where the Legislature had not expressly enumerated assisted living facilities in that statute. [76-81]

Appeal from a decision of the Appellate Tax Board.

*Martin J. Newhouse (Bonnie Schroeder McGuire* with him) for the taxpayer.

*David J. Martel* for Board of Assessors of Longmeadow.

Mills, J. The plaintiffs (taxpayers) sought abatement from property taxes imposed by the board of assessors of the town of Longmeadow (town) for fiscal years 1999, 2000, and 2001.[2] When the town denied abatement, the taxpayers appealed to the Appellate Tax Board (board) pursuant to G. L. c. 59, §§ 64 and 65. After the board upheld the abatement denial, the taxpayers instituted this appeal.

---

[1]Jewish Nursing Home of Western Mass., Inc., and JGS Housing Services, Inc.

[2]The town valued the property at $3,909,100 for fiscal year 1999 and at $5,639,600 for fiscal years 2000 and 2001. On this basis, it assessed taxes of $77,947.45 for two quarters in 1999, $107,603.56 for fiscal year 2000, and $110,536.16 for fiscal year 2001. These taxes were timely paid, and an abatement was timely sought.

1. *Background.* We summarize the facts, as they occurred during the tax years in question, from the board's carefully written findings of fact and report, which are all supported by substantial evidence.[3] See *Donlon* v. *Assessors of Holliston,* 389 Mass. 848, 851 n.3 (1983). The appellants, Jewish Geriatric Services, Inc. (Jewish Geriatric), Jewish Nursing Home of Western Mass, Inc. (JNH), and JGS Housing Services, Inc. (JGS), are all affiliated organizations, each established as a not-for-profit charitable corporation under G. L. c. 180, and each classified under § 501(c)(3) of the Internal Revenue Code. Jewish Geriatric is the parent corporation of JNH and JGS. JNH owns the real estate located at 780 Converse Street in Longmeadow, which is the subject of this appeal, and leases it to JGS. On that property, JGS operates an assisted living facility known as Ruth's House.[4]

The building is a three-level structure with sixty-four resident apartments of either one or two rooms. There are also common areas at Ruth's House, including dining and social areas, activity areas, a wellness center and outdoor grounds and paths.

In keeping with the philosophy of assisted living programs generally, and also with the Commonwealth's applicable law, G. L. c. 19D, Ruth's House attempts to create a dignified residential setting for seniors. See, e.g., G. L. c. 19D, § 16. Since Ruth's House does not provide twenty-four hour nursing care, residents requiring such services are not eligible for residency. Ruth's House conducts a screening process for prospective residents to assess whether they are physically and medically suited for the facility, which offers three different levels of assistance to its residents. The basic service level includes three meals per day, transportation to medical appointments, health monitoring, laundry, housekeeping, social activities, and assistance with up to three activities of daily living (ADLs) such as bathing, dressing, eating, and toileting. At the next level, the "Assisted Living Plus" program provides for ad-

[3]Although the evidence before the board was undisputed, the taxpayers argue that the board "ignored" important facts, such as the extreme old age of the residents of Ruth's House. See note 4, *infra.*

[4]Hereinafter, "Ruth's House" refers variously to the facility or the collective taxpayers.

ditional assistance with ADLs beyond the three that are included in the basic services. Finally, in the "Reminiscence Neighborhood," Ruth's House assists residents with Alzheimer's disease or other memory impairments at the same level as the residents in "Assisted Living Plus" program, but in a more secure setting designed especially for memory-impaired residents.

According to the fee schedule that Ruth's House provided, daily rates vary depending upon the level of care (basic assisted living, assisted living plus, or reminiscence neighborhood) and the size and nature of the room (shared companion suite, private one-room suite, or private two-room suite).[5] For thirty days of occupancy and care, the cost for basic assisted living ranged from $1,890 to $4,200; assisted living plus ranged from $2,580 to $4,890; and the reminiscence neighborhood, $3,000 to $5,280.[6] In addition, Ruth's House charges a one-time community fee equal to sixty days at the resident's applicable base rate (amounting to between $3,780 and $8,580), which must be paid before occupancy begins.

Ruth's House, which does not accept Medicaid supplements, also requires that each resident submit a "Responsible Party Agreement," signed by a third party, guaranteeing payment in the event that the resident fails to make payments when due. The facility also offers a subsidy program, which, during the years at issue, provided assistance to between fourteen and seventeen residents per year, with only one resident ever receiving more than $15,000 per year in subsidies.[7] Although Ruth's House indicated that it sought to save some of its available subsidies for current paying residents who might become unable to pay in the future, the chairman of the board of Jewish Geriatric admitted that Ruth's House would evict residents who

---

[5]The total daily fees include a base rate and, for all residents other than those in basic assisted living, an additional daily fee.

[6]We extrapolate from the daily rates presented by Ruth's House and found by the board in order to approximate the monthly rates.

[7]The base rate for any particular person receiving a subsidy is not clear from the board's opinion or from the record. Therefore, after receiving a $15,000 annual subsidy, a resident may have had to pay as little as $7,995 in annual fees for one room in a basic assisted living companion suite or as much as $49,240 for a two-room unit in the reminiscence neighborhood, in addition to any community fee she may have paid in that year.

could not pay. Under a residency agreement, Ruth's House also requires residents to maintain their own health and liability insurance in adequate amounts.[8]

Upon these facts, the board concluded that (1) Ruth's House offers its residents full legal tenancy; (2) the residents, rather than Ruth's House or any of the taxpayer corporations, were the actual occupants of the property; and (3) in that the facility benefited only a limited segment of the population rather than the community at large, it was not operated as a charitable endeavor.

2. *Discussion.* In reviewing a decision of the board, we will not reverse or modify if the decision "is based on substantial evidence and a correct application of the law." *Erving Paper Mills Corp.* v. *Commissioner of Rev.*, 49 Mass. App. Ct. 14, 17 (2000). *RHI Holdings, Inc.* v. *Commissioner of Rev.*, 51 Mass. App. Ct. 681, 685 (2001). We recognize the board's expertise in tax matters and give some deference to its decisions, and in mixed questions of fact and law, we deem the evidence insufficient only where "a contrary conclusion is not merely a possible but a necessary inference from the findings." *Erving Paper Mills Corp.* v. *Commissioner of Rev.*, 49 Mass. App. Ct. at 17, quoting from *Olympia & York State St. Co.* v. *Assessors of Boston*, 428 Mass. 236, 240 (1998). As to questions of law, we consider those raised before the board and set out separately and particularly on appeal. G. L. c. 58A, § 13. *Assessors of Worcester* v. *Knights of Columbus Religious Educ. Charitable & Benevolent Assn. of Worcester*, 329 Mass. 532, 534 (1952).

The board ruled that Ruth's House did not qualify for a property tax exemption for two independently dispositive reasons: (1) the individual residents, rather than the organization, actually occupied the premises as tenants; and (2) Ruth's House was not operated as a charitable endeavor in that it did not benefit a sufficiently inclusive section of the community. We hold that the board correctly determined the second factor, and we decline to consider the first.

---

[8]Under section V(A) of the resident·agreement, "*The Resident is responsible for maintaining at all times his or her own insurance coverage, including health, personal property, liability, automobile (if applicable), and other insurance coverages in adequate amounts. This includes renter's insurance.*"

Under G. L. c. 59, § 2, "All property . . . situated within the commonwealth . . . , unless expressly exempt, shall be subject to taxation[.]" Exemptions are to be strictly construed against the taxpayer. See *Springfield Young Men's Christian Assn.* v. *Assessors of Springfield,* 284 Mass. 1, 5 (1933); *Worcester Masonic Charity & Educ. Assn.* v. *Assessors of Worcester,* 326 Mass. 409, 411 (1950). Under G. L. c. 59, § 5, Third, "[r]eal estate owned by a 'charitable organization' and occupied by another charitable organization 'for the purposes of such other charitable organization' is exempt from taxation . . . ." *Western Mass. Lifecare Corp.* v. *Assessors of Springfield,* 434 Mass. 96, 101 (2001) (hereinafter *Western Mass. Lifecare*).

To qualify for the exemption, taxpayer organizations bear the burden of establishing "clearly and unequivocally," *Boston Symphony Orchestra, Inc.* v. *Assessors of Boston,* 294 Mass. 248, 257 (1936), that they are "literary, benevolent, charitable or scientific institution[s] or temperance societ[ies] incorporated in the commonwealth." *Western Mass. Lifecare,* 434 Mass. at 101, quoting from G. L. c. 59, § 5, Third. Although the Legislature expressly recognized the social value of assisted living facilities in its preamble to G. L. c. 19D,[9] that social value does not necessarily import a charitable purpose. See *Western Mass. Lifecare,* 434 Mass. at 103. Nor is it sufficient for a taxpayer to rest on its nonprofit status. *Id.* at 102, citing *American Inst. for Economic Research* v. *Assessors of Great Barrington,* 324 Mass. 509, 513 (1949). In assessing whether an organization is a charity for purposes of property tax exemption, courts apply a "functional test" that considers "the declared purposes and the actual work performed" by the organization.[10] *H-C Health Servs., Inc.* v. *Assessors of S. Hadley,* 42 Mass. App. Ct. 596, 598-599 (1997), citing *Assessors of*

---

[9]In enacting "An Act Establishing Assisted Living Residences," the Legislature stated that "[t]he general court recognizes that assisted living residences are an important part of the spectrum of living alternatives for the elderly in the commonwealth." St. 1994, c. 354, § 1.

[10]The town did not challenge the taxpayers' status as charitable organizations, but it alleged that the operation of Ruth's House was not in furtherance of the charitable purposes for which the taxpayer corporations were organized. However, the facts do not reveal inconsistencies between the declared purposes and the actual work of the corporations, and the board does not discuss any differences. We note, in particular, the primary declared purpose of JGS, the

*Boston* v. *Vincent Club*, 351 Mass. 10, 12 (1966). "[T]he organization 'must prove that it is in fact so conducted that in actual operation it is a public charity.' " *Western Mass. Lifecare,* 434 Mass. at 102, quoting from *Jacob's Pillow Dance Festival, Inc.* v. *Assessors of Becket*, 320 Mass. 311, 313 (1946). Factors in the functional test include an assessment whether the organization serves "a sufficiently large or indefinite class so that the community is benefited by its operations," *Western Mass. Lifecare*, 434 Mass. at 103-104, quoting from *Harvard Community Health Plan, Inc.* v. *Assessors of Cambridge*, 384 Mass. 536, 543 (1981), and whether the purported charity lessens a burden that would otherwise be assumed by the government. *Western Mass. Lifecare, supra* at 105-106, and cases cited.

Here, as the town conceded that the taxpayers were charitable in nature, the board considered specifically whether they used the property for charitable purposes, properly applying the same test to the use of the property as it would to the nature of the organizations owning and using it.

In *Western Mass. Lifecare, supra,* the court determined that a particular continuing care retirement community (Reeds Landing), which included independent living units, assisted living units, and a skilled nursing facility, did not qualify for the property tax exemption because its entrance fees and monthly fees made it inaccessible to a large segment of the population and because the population it served would not otherwise require governmental assistance with housing or health care. 434 Mass. at 105-106. The court held that:

> "[T]he operation of Reeds Landing fails a critical
> component of our tests for charitable exemption from
> property taxes, namely, that *the persons who are to benefit
> must be 'of a sufficiently large or indefinite class so that*

---

lessee of the property, "[t]o establish, maintain, and operate an assisted living facility or otherwise to provide support services, including personal care, food, laundry, maintenance, and other social and recreational services, to those residing in the facility." There is no basis for disagreement whether Ruth's House met this purpose. Instead the question is whether this work, and particularly the use of the property for this work, was sufficiently charitable to satisfy the property tax exemption.

> *the community is benefited by its operations.' . . .* An
> organization 'operated primarily for the benefit of a limited
> class of persons,' such that 'the public at large benefit[s]
> only incidentally from [its] activities,' is not charit-
> able. . . . While there is no 'precise number' of persons
> who must be served in order for an organization to claim
> charitable status, and 'at any given moment an organiza-
> tion may serve only a relatively small number of persons,'
> membership in the class served must be 'fluid' and must
> be 'drawn from a large segment of society or all walks of
> life.' . . . Thus, *selection requirements, financial or*
> *otherwise, that limit the potential beneficiaries of a*
> *purported charity will defeat the claim for exemption."*

*Id.* at 103-104. Although an organization may charge a fee for
its services and still be deemed charitable, "[a]n organization
that has expressly limited its services to those who are
financially well off" does not qualify as a charity. *Id.* at 105.

While the Supreme Judicial Court has not set a bright line
test for determining whether an organization serves "a suf-
ficiently large or indefinite class," the evidence supports the
board's conclusion that Ruth's House, like Reeds Landing,
serves only a financially independent segment of our popula-
tion, defeating its claim that it serves a charitable purpose. We
are not persuaded by the taxpayers' attempts to distinguish their
facility from Reeds Landing. Although Ruth's House suggests
that the determinative factor in *Western Mass. Lifecare* was the
high entrance fee required of residents, Reeds Landing ap-
plicants could opt to enter assisted living units for no entrance
fee at all. 434 Mass. at 100. Further, Ruth's House's monthly
fees of $1,890 to $5,280 are comparable to, if not higher than,
the $2,700 to $3,500 monthly fees charged to assisted living
residents at Reeds Landing. *Ibid.* Ruth's House emphasizes that
it requires no financial information from prospective residents
unless they seek a subsidy, whereas all Reeds Landing ap-
plicants were required to prove that they had sufficient assets
and income to pay entrance fees (if any) and monthly fees. *Id.*
at 99. However, Ruth's House's demand for a guarantor oper-
ates to similarly limit the pool of financially eligible applicants.
In particular, we defer to the board's determination that Ruth's

House's minimal subsidies resulted from its screening out of a large portion of the elderly community.

Another factor in assessing charitable purpose is whether the organization relieves the government of a burden it would otherwise be obligated to carry. *Western Mass. Lifecare*, 434 Mass. at 105-106, and cases cited. There is no evidence in the record that Ruth's House relieves such a burden. That some of the residents of Ruth's House would be physically unable to live independently is irrelevant to the taxpayers' contention that the government would have to care for them if there were no Ruth's House. Despite the partial subsidies provided to some residents, there is no evidence that those same residents would otherwise be unable to purchase less expensive care elsewhere or that they would be forced to resort to public assistance were it not for Ruth's House. In fact, Ruth's House requires that residents maintain adequate health insurance, a factor the Supreme Judicial Court considered relevant to its determination that Reeds Landing did not relieve the government of any appreciable burden. *Western Mass. Lifecare*, 434 Mass. at 106. The evidence discloses that even if some residents of Ruth's House would *medically* qualify for Medicaid, few would *financially* qualify, as they have the financial means to pay for their own care. Ruth's House concedes that a person lacking either a guarantor or access to funds of his or her own, in essence a person who might qualify for public assistance, would in all likelihood be evicted.[11] Thus, it cannot fairly be said that Ruth's House relieves the government of any particular burden.

In drafting the assisted living law, the General Court addressed property taxation in a limited way.[12] Had the Legislature been inclined to exempt all assisted living facilities from

---

[11]There was evidence before the board that no one has ever been admitted to Ruth's House without a guarantor.

[12]Neither the parties nor the board made reference to G. L. c. 19D, § 18(*c*), which states:

> "For the purposes of this chapter, and any other general or special law classifying real estate property for the purpose of taxation, and notwithstanding the provisions of [G. L. c. 29, § 27C], a municipality shall classify the portion of any building operated as an assisted living residence in the same category as property held or used for human habitation."

General Laws c. 59, § 2A(*b*), as inserted by St. 1979, c. 797, § 11, provides

property taxes, it would have expressly provided such an exemption. Given its clear support for assisted living facilities, however, the Legislature may choose to expressly exempt some of them from property tax obligations in the future. We leave that decision to its sound judgment. Compare *Conners* v. *Northeast Hosp. Corp.*, 439 Mass. 469, 476-477 (2003). We suspect that such legislation would set forth concrete criteria for exemption qualification, addressing with particularity subsidy requirements, if any.

3. *Conclusion.* Given the current statutory framework and the facts presented in this case, we uphold the board's ruling that Ruth's House does not serve a charitable purpose and thus does not clearly and unequivocally qualify for a property tax exemption under G. L. c. 59, § 5, Third.

The decision of the Appellate Tax Board is affirmed.

*So ordered.*

that "property used or held for human habitation containing one or more dwelling units" shall be classified as "[c]lass one, residential," but that "[s]uch property may be exempt from taxation under other provisions of law." Therefore, the Legislature's reference to property taxation in the assisted living law tells us only that the General Court preferred residential over commercial classification in the event that such facilities were not exempt.