# Lasell Village, Inc. *vs.* Board of Assessors of Newton.

No. 05-P-528.

Suffolk. February 6, 2006. - September 21, 2006.

Present: Perretta, Kafker, & Green, JJ.

*Taxation,* Real estate tax: abatement, Educational institution, Real estate tax: charity.

The Appellate Tax Board (board) correctly concluded that a continuing care retirement community owned and operated by the taxpayer was not a charitable institution devoted to educational purposes and therefore was not exempt from taxation under G. L. c. 59, § 5, Third, for the fiscal year in issue, where the educational activities provided by the retirement community were not dominant, and where the designation of the retirement community as a "nonprofit educational institution" for zoning purposes was not based upon any consideration whether the retirement community's activities were predominantly educational during the relevant time period [421-423]; moreover, the board's findings to the effect that the dominant purpose of the retirement community was not educational were supported by substantial evidence [423-427].

Appeal from a decision of the Appellate Tax Board.

*James J. Marcellino* for the taxpayer.

*John M. Lynch (Stephen W. Decourcey* with him) for the Board of Assessors of Newton.

Perretta, J. Lasell Village, Inc. (Lasell), owns and operates a continuing care retirement community (the Village) situated on land leased to it by Lasell College (the college). Village residents were, as of 2001, required to participate annually in various educational activities offered by the college and Lasell. When, for fiscal year 2002, the board of assessors of Newton (assessors) assessed a tax on the real estate being used and occupied by the Village, Lasell applied for an abatement from the Appellate Tax Board (the board). On appeal from the board's denial of the application, Lasell argues that the Village is a charitable institution

devoted to educational purposes and was, therefore, exempt from taxation under G. L. c. 59, § 5, Third, for the fiscal year in issue. We affirm the decision of the board.

1. *The relevant facts.*[1] Lasell presented its case to the board through numerous exhibits and the testimony of five witnesses: (1) Thomas DeWitt, the president of the college; (2) Dr. Paula Panchuk, the academic dean of the college; (3) Dr. Phyllis Moen, whose testimony was proffered as that of an expert for purposes of establishing the beneficial impact of the educational programs offered Village residents; (4) a Village resident; and (5) a former student at the college. There was also evidence to show that Lasell is a Massachusetts nonprofit corporation organized under G. L. c. 180. Its restated articles of organization declare that it was formed "[t]o develop and provide . . . residential and non-residential educational programs for elderly persons . . . instruction for students at Lasell College in the gerontological aspects of certain areas of study . . . [and] [to] sponsor and encourage . . . research into the cognitive, emotional and physical needs and capabilities of the elderly [incorporating] the results of such research into [Lasell's] educational programs for the elderly and for the students at Lasell College."

The Village is located on a thirteen-acre parcel of land that Lasell leases from the college. It is a fourteen-building complex containing a total of 162 independent living units (ILUs) as well as a forty-four bed nursing facility called Lasell House. Each ILU is fully functional as a private residence. In addition to living quarters, Lasell provides Village residents with meals and various housekeeping services, e.g., repair and maintenance, trash removal, and local transportation, as well as some health services.

Because Lasell's residential service model contemplated that persons entering its retirement community would be lifetime residents, it provided residents with a variety of benefits, some of which required additional fees, and a continuum of care arrangements up to and including long-term care in Lasell House. In order to become a resident of the Village, an applicant was required to be a high school graduate of at least sixty-five years

---

[1]We take the facts as they were at the time of Lasell's application for an abatement for fiscal year 2002.

of age and in sufficiently good health as to be able to perform, without assistance, the activities of daily living. Residents paid a one-time entrance fee as well as a monthly service fee which was calculated on the basis of the size of the ILU and the various benefits afforded a resident of any particular ILU.

As of July 1, 2001, entrance fees ranged from $197,000 to $790,000, and basic monthly service fees totaled between $1,733 to $4,751. Prospective residents were required to demonstrate ownership of assets valued at twice the amount of the entrance fee associated with the selection of any particular ILU and receipt of stable income in an amount equal to twice the amount of the monthly fees. Residents were also required to maintain, at their own expense, Medicare health insurance and at least one other supplemental health insurance policy approved in writing by Lasell.

Lasell styled and marketed the Village as a living and learning retirement community. As a condition of residency, residents agreed to participate annually in 450 hours of approved educational activities; that is, approximately one hour and fifteen minutes each day. Under Lasell's residency and care agreement, an intentional failure to fulfil this educational requirement for one calendar year was a ground for removal of the resident from the Village. However, residents could be temporarily or permanently exempted from the educational requirement upon a physician's certification of a physical or mental inability to participate. Although residents of Lasell House and other residents were excused from participation, the rest of the residents were expected to maintain a record of the time spent in educational activities. Lasell conducts a biannual "countdown," a process during which residents collect their records and report to Lasell the total number of hours spent in meeting the educational requirement.[2]

Educational services were to be provided to residents of the Village by the college pursuant to an educational services agreement between Lasell and the college. According to the terms of

[2]The evidence concerning the "countdown" is somewhat ambiguous on whether it was conducted biannually or whether it had been conducted twice during Lasell's operation of the Village and the time of its application for an abatement.

that agreement, Village residents are allowed to enroll in the college's undergraduate courses and to use various facilities of the college, e.g., the library, the computer laboratory, and athletic equipment, as well as various other amenities made available by the college to its students.[3] Lasell also offers Village residents an on-site program of noncredit courses, discussion groups, lectures, and physical fitness classes.[4] These classes and discussion groups are conducted once a week for a period of about one to two hours and are led by college faculty members or students as well as some residents and cover a broad range of topics, such as writing, literature, drama, music, mythology, current events, and contemporary social issues.[5] Neither examinations nor grades are involved in the on-site educational program.

All on-site lectures as well as some of the other courses were offered under the auspices of the "Laselle Institute for Learning in Retirement" (the Institute). Membership in the Institute was one of the basic educational services afforded to all Village residents as well as to the residents of Newton who choose to become members of the Institute. A one-year membership in the Institute cost $100, but waivers of that fee were available. The Institute annually serves about twenty members of the community.

Village residents could fulfil their education requirement through participation in any of Lasell's formal education programs

---

[3]Most of the residents who enroll in college courses do so as "participating students" who do not take examinations or receive grades. Although participating students are not required to write papers over ten pages in length, they must complete all other course assignments.

[4]Certain common areas in each of Lasell's fourteen buildings are used for this program. Six of the fourteen buildings house a meeting room used as a classroom. One of these meeting rooms is equipped with five computers. These common areas also provide the residents with three library and reading rooms, a ballroom sometimes used for lectures and classes, an art studio, a room with a linoleum floor used for dancing and group exercise classes, a greenhouse, an exercise room, and a pool.

[5]Although the board found that Lasell "failed to clearly identify the faculty of Lasell Village" and that "[s]ome activities appear to have been led by residents themselves, or itinerant speakers of unknown credentials," there was some evidence suggesting otherwise. Lasell put in evidence course booklets identifying the course and the credentials of its leader. As described in the booklets, many of the courses were conducted by the college's professors and highly educated residents appearing to have some particular and relevant experience.

offered by the college. They could also receive credit by undertaking activities outside those formal programs.[6] As broadly defined by Lasell, education includes independent, self-directed endeavors, cultural activities, physical exercise, paid work, and community service. As implemented, Lasell's educational program gives credits to residents for visiting museums, attending concerts, viewing nature exhibits, traveling, gardening, sculpting, stretching, walking, swimming, playing tennis, and assisting other residents in preparing their tax returns.

There was also evidence to show that Lasell has served as a host site for the college's undergraduate interns and honor students who interacted with the residents in accordance with "periodically" devised assignments of their professors. In October of 2001, Lasell hosted a conference entitled "Redefining Retirement Communities."

Lasell also put before the board evidence of historic facts that it claims are relevant to its appeal. In 1991, the college and the city of Newton (the city) entered into an agreement for judgment (the agreement) in settlement of a zoning dispute concerning the property in issue. In the agreement, the city stipulated that Lasell's proposed project, Lasell Village, was, as described in the agreement, a "non-profit educational community" and a protected educational use for purposes of G. L. c. 40A, § 3. The agreement also expressly provided that it "is intended to deal solely with the application of [Newton's zoning] Ordinance to Lasell Village," and that nothing therein "relieve[s] Lasell College or Lasell Village from complying with any other [applicable] . . . state or local laws, statutes, regulations, or ordinances." Pursuant to a provision of the agreement, the college and the city also executed an agreement for payments in lieu of taxes, a so-called "PILOT" agreement.

Further, in an unpublished memorandum and order, *Lasell College* v. *Newton*, 36 Mass. App. Ct. 1122 (1994), we affirmed a determination of the Land Court that Lasell was a nonprofit educational corporation and that its proposed project, Lasell

---

[6]For example, a resident could receive credit of up to 300 hours of paid or unpaid work and up to 100 hours of physical fitness activities.

Village, constituted a protected educational use for purposes of G. L. c. 40A, § 3.

2. *The applicable law.* General Laws c. 59, § 5, Third, exempts from local taxation "real estate owned by . . . a charitable organization and occupied by it or its officers for the purposes for which it is organized."[7] See *Harvard Community Health Plan, Inc.* v. *Assessors of Cambridge,* 384 Mass. 536, 541 (1981). As explained in *Massachusetts Med. Soc.* v. *Assessors of Boston,* 340 Mass. 327, 332 (1960):

> "An institution will be classed as charitable if the dominant purpose of its work is for the public good and the work done for its members is but the means adopted for this purpose. But if the dominant purpose of its work is to benefit its members or a limited class of persons it will not be so classed, even though the public will derive incidental benefit from such work."

See also *Western Mass. Lifecare Corp.* v. *Assessors of Springfield,* 434 Mass. 96, 103-105 (2001). As these authorities instruct, evidence of an organization's dominant purpose is to be found in its charter or articles of association, its by-laws, and its actual activities. See *New England Legal Foundation* v. *Boston,* 423 Mass. 602, 610 (1996); *H-C Health Servs., Inc.* v. *Assessors of S. Hadley,* 42 Mass. App. Ct. 596, 599 (1997).

"[A]n educational institution of a public charitable nature falls within" the exemption provided by the statute. *Cummington Sch. of the Arts, Inc.* v. *Assessors of Cummington,* 373 Mass. 597, 602 (1977). The exemption provided by G. L. c. 59, § 5, Third, is available to a taxpayer found to be an "educational institution," that is, a taxpayer who "makes a contribution to education" and whose education or the advancement of education is its "dominant activity." *Id.* at 603. See *Brockton Knights of Columbus Bldg. Assn.* v. *Assessors of Brockton,* 321 Mass. 110, 115 (1947)

---

[7]As noted from the outset, the Village is located on land owned by the college and leased to rather than owned by Laselle. It is, however, settled that "[r]eal estate owned by a 'charitable organization' and occupied by another charitable organization 'for the purposes of such other charitable organization' is exempt from taxation under G. L. c. 59, § 5, Third." *Western Mass. Lifecare Corp.* v. *Assessors of Springfield,* 434 Mass. 96, 101 (2001). See *Sturdy Memorial Foundation, Inc.* v. *Assessors of N. Attleborough,* 60 Mass. App. Ct. 573, 574 (2004).

("fact that a corporation performs many charitable functions . . . does not render its real estate exempt from taxation, where the dominant use of property is noncharitable").

An exemption from taxation is recognized "only where the property falls clearly and unmistakably within the express words of a legislative command," *Boston Chamber of Commerce* v. *Assessors of Boston*, 315 Mass. 712, 716 (1944), and it is the taxpayer who bears the burden of proof on the claim of exemption. See *Boston Symphony Orchestra, Inc.* v. *Assessors of Boston*, 294 Mass. 248, 257 (1936). The board's decision on the matter "will not be reversed or modified if it is based on substantial evidence and a correct application of the law." *Erving Paper Mills Corp.* v. *Commissioner of Rev.*, 49 Mass. App. Ct. 14, 17 (2000). See *New Boston Garden Corp.* v. *Assessors of Boston*, 383 Mass. 456, 466 (1981); *Tennessee Gas Pipeline Co.* v. *Assessors of Agawam*, 428 Mass. 261, 262 (1998).

3. *The board's decision.* In denying Lasell's application for an abatement, the board ruled that Lasell had failed to sustain its burden of demonstrating its entitlement to an exemption as a charitable organization devoted to educational purposes. Lasell's dominant purpose, work, and goal was to provide supportive housing to the elderly rather than education. As determined by the board, "[t]o the extent Lasell Village engaged in 'educational' programming, these activities were incidental to [its] major purpose of [operating] a continuing care residential community."

The board also found that the financial and health prerequisites for residency at the Village so limited the class of persons potentially benefited by Lasell's operation that it could not be said that Lasell operated as a public charity for the benefit of the community at large.[8] As found by the board, Lasell failed to show either that it operated the Village as a public charity dedicated to

___

[8]Operating nursing homes for the elderly as well as providing the elderly with health care have been recognized as charitable work. See *Western Mass. Lifecare Corp.* v. *Assessors of Springfield*, 434 Mass. at 103, and cases therein cited. The board has recognized that the work of providers of housing and related support services aimed at promoting the welfare of elderly persons and assisting them to live independently is work with a charitable purpose. See Island Elderly Hous., Inc. *vs.* Assessors of Tisbury, A.T.B. Docket No. 181488 (February 19, 1997).

the benefit of the community at large or that it was likely that Lasell would alleviate the Commonwealth's burden of government with respect to its elderly citizens. Compare *Western Mass. Lifecare Corp.* v. *Assessors of Springfield*, 434 Mass. at 104-105; *Jewish Geriatric Servs., Inc.* v. *Assessors of Longmeadow*, 61 Mass. App. Ct. 73, 78-80 (2004).[9]

4. *Discussion.* Lasell's first argument on appeal is that because it was determined in 1993 to be an "educational institution" for purposes of G. L. c. 40A, § 3, it was entitled to the tax exemption provided educational institutions under G. L. c. 59, § 5, Third, for fiscal year 2002. Our consideration of Lasell's arguments and controlling authorities leads us to conclude that Lasell's status as an educational institution for zoning purposes was not conclusive on the issue of its tax-exempt status.

First, the two statutes, G. L. c. 40A, § 3, and G. L. c. 59, § 5, Third, have different purposes. In *Gardner-Athol Area Mental Health Assn.* v. *Zoning Board of Appeals of Gardner*, 401 Mass. 12, 15 (1987), the court stated:

> "There is nothing in G. L. c. 40A, § 3, as the board argues, that requires that education be the dominant purpose or primary activity of a nonprofit corporation in order that it may qualify as a nonprofit educational corporation under § 3."

See *Campbell* v. *City Council of Lynn*, 32 Mass. App. 152, 156 (1992), *S.C.*, 415 Mass. 772 (1993).

By contrast, as we have observed, under G. L. c. 59, § 5, Third, the exemption for nonprofit educational entities is available only where educational activities are dominant. See *Cummington Sch. of the Arts, Inc.* v. *Assessors of Cummington*, 373 Mass. at 603. The mere fact that Lasell's articles of organization permitted it to engage in educational activities was insufficient to establish that it was an educational institution for purposes of G. L. c. 59, § 5, Third. See *Jacob's Pillow Dance Festival, Inc.*

---

[9]As an alternative ground for its decision, the board concluded that Lasell had failed to demonstrate that the real estate in issue was "occupied" by Lasell rather than by the residents of the Village. Because we resolve this dispute on the basis of the question of Lasell's status as a charitable educational institution, we do not consider whether Lasell or the Village residents "occupied" the premises within the meaning of G. L. c. 59, § 5, Third.

v. *Assessors of Becket*, 320 Mass. 311, 313 (1946) (purposes for which taxpayer was incorporated not decisive; taxpayer required to prove it actually operated as public charity); *Brockton Knights of Columbus Bldg. Assn.* v. *Assessors of Brockton*, 321 Mass. at 113-115 (organization's declared purposes not controlling on question of entitlement to exemption where organization's dominant use of property failed to carry out declared purposes).

Moreover, Lasell's status as a "non-profit educational institution" was determined for zoning purposes in 1993, that is, some seven years before Lasell began its actual operations in 2000. Further, the zoning ruling was not based upon any consideration whether Lasell's so-called activities were predominantly educational during the time period relevant to the present dispute.[10]

Nor do we find force in Lasell's second argument, that the board was somehow bound or restricted by the 1991 agreement for judgment and the related PILOT agreement between Lasell and the city wherein the city stipulated that Lasell was a "non-profit educational community." Those agreements were entered into during settlement of the zoning dispute. The agreement for judgment expressly provided that it was entered into for the sole purpose of dealing with the zoning dispute and was not intended to relieve the college or the Village from compliance with "any other [applicable] . . . state or local laws, statutes, regulations, or ordinances." See part 1, *supra*.

The sole authority cited by Lasell in support of its claim that the board was bound by the agreements, *General Elec. Co.* v. *Assessors of Lynn*, 393 Mass. 591 (1984), is inapposite. There the court held that the assessors' answers to interrogatories from unrelated proceedings constituted no more than evidentiary admissions which properly could be considered. *Id.* at 603-604. To the extent the city's stipulation could be considered by the

---

[10]The Land Court decision in the zoning issue was based on Lasell's proposal to provide formal education programs, a structured course of study, an on-campus teaching and training site for the college's undergraduate students, and internship and research opportunities for faculty and students of affiliated educational institutions. The proposed education program was to be a combination of liberal arts and professional certification courses, studio courses, physical education courses, and internships. Less than fifty percent of Village buildings were to be devoted to sleeping quarters.

board, it was far from conclusive and could be contradicted by competent evidence showing that Lasell's dominant purpose was not education. *Ibid.* The board reasonably could have determined that the agreements relied upon by Lasell had little probative value pertaining to its proposed rather than actual operations. Moreover, Lasell had conceded by the express terms of the agreements that they were confined to zoning regulations.[11]

Lasell's final claim is that the board's findings are not supported by substantial evidence. The board found that (1) Lasell's education program was only one of a comprehensive array of services the Village offered to its elderly residents, that only five percent of the $4.7 million of revenue generated annually by the residents' monthly fees was expended on its educational programs and the remaining ninety-five percent on the Village's operational expenses; (2) residents were not required to devote a substantial portion of their time to educational pursuits; (3) although the residential agreement signed by prospective residents required that they participate annually in 450 hours of educational activities, Lasell's compliance oversight was at best informal and at worst lax; and (4) the Village's educational program was so flexible in scope and practice as effectively to be discretionary with the individual resident.

Our review of the record leads us to conclude that the board's findings are supported by the requisite quantum of evidence and are consistent with its conclusion that although Lasell's service model included a learning program intended to promote the cognitive and physical well-being of elderly persons, its dominant purpose was to provide a residential community with a continuum of supportive and health services designed to meet the changing needs of its elderly residents.

In challenging the board's findings, Lasell argues that the evidence concerning the educational character of its offered programs, the class of persons benefitted by its work, and its dominant purpose was, in near wholesale fashion, ignored. Put somewhat more specifically, Lasell argues that (1) the board failed to consider or to credit evidence showing that its work was

---

[11]To the extent Lasell's argument could be read as based upon principles of estoppel, we do not consider it. See Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975).

consistent with its restated articles of organization and encompassed activities outside the operation of its retirement community (research, conferences, graduate and undergraduate education, and community education programs for the elderly); (2) the only reason the board refused to recognize it as an educational institution was the fact that its programs were nontraditional and served a nontraditional student population, contrary to the broad interpretation given to the term "education"; and (3) the board took an unjustifiably restrictive view of the benefits of Lasell's work, which, according to Lasell, extended beyond the Village's residents to students of the college, elderly persons in general, and the public at large.

Lasell also makes a sweeping claim that the education of the college's students was enhanced by the presence of Village residents in their classrooms, opportunities for internships at the Village, and class assignments involving the residents. It described the Village as an important "experiment" in providing of housing and educational services for elderly persons with the potential to serve as a "best practices" model for the improvement of housing arrangements for the elderly and for successful aging. Lasell also maintains that all society benefits from its promotion of interaction and communications between younger and older generations.

We reject all the claims of Lasell that are based on the premise that the board's findings are not supported by substantial evidence, that is, evidence that a reasonable mind might accept as adequate to support a conclusion, taking into account whatever in the record fairly detracts from its weight. See *New Boston Garden Corp.* v. *Assessors of Boston*, 383 Mass. at 466; *Tennessee Gas Pipeline Co.* v. *Assessors of Agawam*, 428 Mass. at 262. Our review of the record shows, as discussed below, that Lasell's arguments are based upon either proffered but excluded evidence, or admissible evidence considered but found unpersuasive by the board. See *Catlin* v. *Board of Registration of Architects*, 414 Mass. 1, 6 (1992) (board's choice not to refer to particular piece of evidence in its decision does not imply failure to consider that evidence).

As Lasell asserts, and we agree, there are aspects of its operations aside from its programs for Village residents that at

least arguably advance education and research for a better understanding of issues involved in the aging process. However, Lasell failed to show that its activities were in fact carried on to the extent or degree that would warrant our disturbance of the board's determination as to Lasell's dominant purpose. The assessors successfully moved to strike Lasell's evidence, which was offered for the purpose of showing its actual operations concerning the establishment of a research institute and graduate management degree in elder care services during fiscal year 2002.[12] Lasell has not challenged that ruling on appeal and therefore is precluded from attacking the board's finding on the basis of that evidence. See Mass.R.A.P. 16(a)(4). Lasell presented no other relevant evidence to show that it was involved in research either as an investigator or the subject of study.[13]

As for the evidence showing that the Village had served with indeterminate frequency as a host site for the college's undergraduate student internships and honors work, that the students taught some of the computer literacy classes offered at the Village, and that Lasell's professors "periodically" devised assignments

[12]The college's academic dean testified that during the winter and early spring of 2001, there were formal proposals under consideration for the establishment of a research institute at the Village as well as for the establishment by the college of a master's degree program in management with a concentration in elder care in which the Village would have some involvement. However, as of the time of the proceedings before the board, none of these formal proposals had been approved. Consequently, the board ruled that evidence of the Village's possible future activities and intentions was not competent evidence to establish that the Village was, in fact, operated for charitable purposes during the fiscal year in question. The board also excluded, rather than failed to consider, the opinions of Lasell's expert witness regarding the effects of the Village's educational programs. Nor did the board ignore the provisions of Lasell's restated articles of organization and by-laws or the evidence of the educational programs it operated for the residents of the Village and senior citizens of Newton. To the contrary, evidence of Lasell's declared purposes and educational programs received explicit and extensive consideration by the board in its findings. The board simply declined to draw from that evidence the inferences desired by Lasell.

[13]Although there was evidence to show that the Village had allowed investigators from unaffiliated institutions to recruit residents as subjects in four research studies related to issues of aging, that evidence did little to show that Lasell's actual use and occupancy of the leased premises was for the charitable purposes for which it was organized. Cf. *Brockton Knights of Columbus Bldg. Assn.* v. *Assessors of Brockton*, 321 Mass. at 114.

that required the students to engage with residents of the Village, the board reasonably could have concluded that such activities were minimal in relation to the operation of Lasell's retirement community. Such a conclusion is entitled to deference notwithstanding the fact that Lasell's operation of the Village served socially valuable purposes. See *Western Mass. Lifecare Corp.* v. *Assessors of Springfield*, 434 Mass. at 103; *Jewish Geriatric Servs., Inc.* v. *Assessors of Longmeadow*, 61 Mass. App. Ct. at 77.

The board also made findings to the effect that Lasell's education programs, such as they were, operated primarily for the benefit of its residents and not the Newton community. These findings were supported by evidence that showed that only a subset of Lasell's on-site classes were made available to the residents of Newton, that classes open to the community were customarily held in only one of Lasell's classrooms, and that from the time the Village opened its doors, the Institute annually served no more than about twenty members from the community at large.

Nor are we persuaded by Lasell's argument that the board refused to recognize it as an educational institution because its education programs were nontraditional. Our review of the record shows that the board inferentially rather than explicitly found that the dominant purpose of many of Lasell's educational activities was unrelated to formal instruction but was more in the nature of leisure and recreation. We think it unnecessary to undertake a detailed recitation of the board's findings concerning the educational nature of the varied programs and activities that Lasell insists are educational.[14] The point is that even if the term "education" is construed as broadly as Lasell urges, educational activities were not the dominant focus of Lasell's work and were unavailable to a sufficiently broad or definite class of persons to allow for the conferment of charitable status upon it under G. L. c. 59, § 5, Third.

---

[14] We do point out, however, that the board did take note of the absence of certain indicia of traditional educational programs, such as grades, examinations, degrees, or a purpose to train a student for a profession or other employment opportunities. The board could properly consider such factors in determining whether Lasell is an educational institution.

To the extent elderly persons and society at large are, as Lasell contends, benefited by its self-described innovative model for continuing care services, the promotion of concepts of active retirement, and the integration of members of the older and younger generations, we conclude that these societal benefits in this context are insufficient to bring Lasell within the class of charities traditionally recognized by G. L. c. 59, § 5, Third. See *Cummington Sch. of the Arts, Inc.* v. *Assessors of Cummington*, 373 Mass. 597, 603-605 (1977).

We are also unpersuaded that the board erred in determining that Lasell was not operated primarily for public charitable purposes. Although there was evidence to show that Lasell's operation of the Village serves some socially valuable purposes, participates to some degree in the education of the college's students, and offers an adult learning program for the community, we find no error in the board's ultimate findings and conclusion that these activities were so minimal and indirect as to fail to establish that Lasell was, in fact, operated primarily for purposes of public charity. See *Brockton Knights of Columbus Bldg. Assn.* v. *Assessors of Brockton*, 321 Mass. at 115; *Massachusetts Med. Soc.* v. *Assessors of Boston*, 340 Mass. 327, 332-333 (1960).

5. *Conclusion.* The board's decision is based on substantial evidence and the correct application of the law.

*Decision of the Appellate Tax*
*Board affirmed.*