G. Thomas Surtees, in his official capacity as commissioner of revenue for the State of Alabama, and Fran Hamilton, in her official capacity as tax assessor of Madison County (referred to hereinafter collectively as the "taxing authorities"), appeal from a summary judgment entered by the Montgomery Circuit Court in favor of Carlton Cove, Inc. ("Carlton"), and Redstone Military Retirement Residence Association ("Redstone"). Carlton and Redstone are nonprofit charitable organizations exempt from federal income taxation under I.R.C § 501(c)(3), and each of them owns and operates a residential retirement *Page 1015 
facility in Madison County serving the elderly. The summary judgment declared that the retirement facilities at issue were exempt from ad valorem taxes pursuant to Ala. Code 1975, §40-9-1(1), and Amendment No. 373(k) to the Constitution of Alabama of 1901, which is now Article XI, § 217, Official Recompilation of the Constitution of Alabama of 1901, both of which exempt property used exclusively for charitable purposes.
In December 2003, Carlton filed this action seeking a declaration that its real property was exempt from ad valorem taxation because Carlton is a charitable organization exempt from federal income tax under I.R.C. § 501(c)(3) and because its property was used exclusively for charitable purposes. In December 2004, Redstone filed a motion to intervene in this action, alleging that it too was a tax-exempt charitable organization, that its facility was used exclusively for charitable purposes, and that its claims against the taxing authorities involved questions of law and fact in common with Carlton's claims. Redstone sought a declaration that its real property was exempt from ad valorem taxation. Redstone's motion to intervene was granted in March 2005.
In June 2005, Carlton and Redstone filed a joint motion for a summary judgment. After hearing oral argument, the trial court, on July 21, 2005, entered an order granting that joint motion. Hamilton and Surtees appealed.[1]
In November 2005, this court found the trial court's judgment to be deficient and reinvested the trial court with jurisdiction for a limited time "to render an adjudication of the rights and liabilities of the parties." In December 2005, the trial court entered an amended summary judgment (1) that declared that the properties at issue are being used "in a charitable manner under Ala. Code § 40-9-1(1) (1975), Ala. Const. Art. IV of 1901, § 91, Ala. Const. Amend No. 373(k) and such properties are thereby exempt from ad valorem taxation," and (2) that enjoined the taxing authorities from assessing or collecting ad valorem taxes on the properties at issue. Hamilton filed an amended notice of appeal from the amended summary judgment.[2]
Carlton owns and operates "Carlton Cove," a gated continuing-care retirement community.[3] Carlton Cove consists of 162 independent-living units[4] and a skilled-nursing *Page 1016 
facility with 105 beds. Carlton Cove is marketed as an upscale residential community offering its residents "luxurious and spacious apartments, duplexes and manor homes" and numerous amenities and common facilities, including a "gracious main dining room," casual dining and snack facilities, an arts and crafts studio, a library, a game room, a woodworking shop, a swimming pool, tennis courts, an indoor spa, and walking trails in a 43-acre fenced community. Carlton Cove opened in February 2003, and its development and construction cost in excess of $75 million.
A resident in one of Carlton Cove's independent-living units must pay an entrance fee ranging from $155,200 to $358,000, depending on the size of the living unit, plus a monthly service fee ranging from $1,731 to $3,362.[5] If a second person (e.g., a spouse) lives in the unit, Carlton charges an additional entrance fee of $36,000 and an additional monthly service fee of $760. The monthly service fee includes 30 meals per month, housekeeping services, utilities, basic cable television service, scheduled local transportation, and limited medical and wellness services. Additional fees are charged for additional meals, unscheduled transportation, home health care, and certain additional services.
Under the most commonly used admission contract at Carlton Cove, the resident is entitled to a return of 90% of the entrance fee, without interest, upon the resident's termination of residency and Carlton's receipt of a new entrance fee for the vacated unit.
If a resident of Carlton Cove suffers a serious decline in health, he or she can be transferred to Carlton Cove's skilled-nursing facility, which is also open to the general public. Residents of Carlton Cove's independent-living units are charged a fee of $84 per day to stay in Carlton Cove's skilled-nursing facility, plus fees for ancillary supplies and services. The fee for a person who is not a resident of Carlton Cove is $150 per day for a semi-private room and $170 per day for a private room, plus fees for ancillary supplies and services. Carlton Cove's skilled-nursing facility does not accept Medicaid patients, for whom it would be able to collect only $130-$140 per day. Residents of Carlton Cove are given priority for admission to the skilled-nursing facility, and it is Carlton's policy to always keep a few of its nursing-facility beds vacant for use by Carlton Cove residents.
All residents of Carlton Cove must meet Carlton's financial guidelines, which are designed to ensure that a resident has sufficient income and assets to provide for his or her care for the remainder of his or her life. Carlton recommends that a prospective resident have net assets equal to 150% of the required entrance fee and a monthly income equal to 175% of the monthly service fee. To qualify for the least expensiveapartment in Carlton Cove, a prospective single resident is expected to have total net assets (before payment of the entrance fee) of a least $232,800 and a monthly income of at least $3,029 ($36,348 per year).[6] There is evidence in the record indicating that there are only approximately 3,100 households in Carlton's primary geographic market that *Page 1017 
meet Carlton's financial guidelines. The record does not disclose the total number of elderly households in Carlton's primary geographic market or the percentage of elderly households that meet Carlton's guidelines.
Carlton's stated policy is not to evict any resident based solely on inability to pay the monthly service fee. Normally, Carlton will advance funds to pay the necessary fees and charge such advances, together with interest thereon, against the refundable portion of the entrance fee. Carlton also has the right in such a case to move the nonpaying resident to a smaller unit. Because of the high entrance fee and Carlton's careful financial screening of prospective residents, Carlton incurs only a negligible risk that it will not ultimately collect the entire amount of the resident's fees.[7]
Carlton's fee structure more closely resembles long-term-care insurance than it does a charitable gift to the residents. The residents pay a large entrance fee and high monthly fees while they are healthy and living in the independent-living units. In return, Carlton agrees to care for them for life, including the more expensive care rendered in the skilled-nursing facility.
Carlton Cove is in many respects almost indistinguishable from a for-profit retirement community. A driving force behind the creation of Carlton Cove was The Haskell Companies, a large national real-estate developer and property manager. The Haskell Companies and its affiliates acted as the developer, the general contractor, and the initial property manager of Carlton Cove, and they have received, or will receive, in excess of $8 million as compensation for their services, including deferred fees.
It is significant that the funding for the construction and development of Carlton Cove did not include any grants or charitable contributions. Instead, Carlton Cove was financed through the issuance of tax-exempt bonds that were sold to investors seeking a competitive return on their investment.[8]
Redstone owns and operates Redstone Village in Huntsville, which is an upscale retirement community comparable to Carlton Cove.[9] Redstone Village is located on an 87-acre "scenic mountaintop," and it consists of independent-living units (apartments and patio homes ranging from 940 sq. ft. to 2,071 sq. ft.), smaller assisted-living apartments, and a skilled-nursing facility, together with luxury amenities and common facilities comparable to those of Carlton Cove.
A resident or couple at Redstone Village must pay an entrance fee ranging from $167,500 to $379,000, plus a monthly service fee ranging from $1,695 to $3,745. For an additional resident sharing a unit, Redstone charges an additional monthly *Page 1018 
service fee of $750, but it does not increase the amount of the entrance fee.[10] The most commonly used admission contract for Redstone Village provides for a refund of 90% of the entrance fee, without interest, upon the resident's vacating the unit and Redstone's receipt of a new entrance fee for that unit.
Redstone recommends that a prospective single resident for itsleast expensive apartment have assets of at least $209,375 and a monthly income of at least $3,390 ($40,680 per year). As of 2005, 17 prospective residents had made a deposit toward residence at Redstone Village and later "backed out" because of concerns that they could not afford Redstone's fees.
Redstone's policy is not to terminate any resident's contract because of financial difficulties beyond the resident's control. Normally, Redstone will advance funds to pay necessary fees and charge such advances, plus interest, against the refundable portion of the entrance fee. Redstone has an endowment fund to assist residents in financial need. As of 2005, the endowment fund consisted of $350, a small fraction of one month's fee for the least expensive unit. Because of the high entrance fees and careful financial screening, it appears that the risk is negligible that any Redstone Village resident will exhaust his or her entrance fee.
Residents of Redstone Village who transition from the independent-living units to the assisted-living units or to the skilled-nursing facility pay a monthly fee of $2,595, plus additional fees if the resident requires a heightened level of care. Redstone's assisted-living units are available to the general public, at fees ranging from $2,895 to $3,495 per month, plus additional fees for a heightened level of care. Redstone Village's skilled-nursing facility is open to the general public, at a cost of $156 per day for a semi-private room and $177 per day for a private room, plus fees for ancillary supplies and services. Redstone does not accept Medicaid patients.
The seed money for the development of Redstone Village was provided by The Greystone Development Company, L.L.C., and its affiliates, a for-profit entity that has participated in the development or redevelopment of more than 60 retirement communities nationwide. The permanent financing for the development and construction of Redstone Village was provided by the issuance of more than $55 million in tax-exempt bonds. Greystone received a development fee of approximately $5.6 million, plus incentive payments; this fee includes reimbursement of amounts advanced by Greystone in connection with the development of Redstone Village. Redstone also pays Greystone additional fees under a management agreement.
On appeal, the taxing authorities contend (1) that the trial court erred in concluding that the properties at issue were automatically exempt from ad valorem taxation because Carlton and Redstone were exempt from federal income tax under I.R.C. § 501(c)(3), and (2) that there was at least a genuine issue of material fact as to whether the real properties at issue were exclusively used for purely charitable purposes.
 "We review a summary judgment de novo, applying the same standard as was applied in the trial court. A motion for a summary judgment is to be granted when no genuine issue of material fact exists and the moving party is entitled to a judgment as a matter of law. Rule 56(c)(3), Ala. R. Civ. P. . . . The court must view the evidence in a light most *Page 1019 
favorable to the nonmoving party and must resolve all reasonable doubts against the movant. Hanners v. Balfour Guthrie, Inc., 564 So.2d 412 (Ala. 1990)."
Bailey v. R.E. Garrison Trucking Co.,834 So.2d 122, 123 (Ala.Civ.App. 2002).
Under Alabama law, all real and personal property is subject to ad valorem taxation unless specifically exempt. Ala. Code 1975, §§ 40-9-1 and 40-11-1(b)(1) (16); Ex parte EmeraldMountain Expressway Bridge, L.L.C., 856 So.2d 834, 839
(Ala. 2003). "Tax exemptions are to be strictly construed against the exemption and in favor of the tax." Grim v. Phipps,601 So.2d 474, 476 (Ala. 1992). See also Emerald MountainExpressway Bridge, 856 So.2d at 839.
The exemption at issue here is set forth in Ala. Code 1975, § 40-9-1(1), which provides in part:
 "The following property and persons shall be exempt from ad valorem taxation and none other:
. . . all property, real and personal, used exclusively for religious worship, for schools or for purposes purely charitable; provided, that property, real or personal, owned by any . . . charitable institution . . . let for rent or hire or for use for business purposes shall not be exempt from taxation, notwithstanding that the income from such property shall be used exclusively for education, religious or charitable purposes."
(Emphasis added.) The foregoing statute implements two constitutional provisions: Article IV, § 91, which prevents the legislature from taxing property "used exclusively . . . for purposes purely charitable," and Amendment No. 373(k), which exempts from all ad valorem taxation "property devoted exclusively to religious, educational or charitable purposes."
The first issue presented on appeal is whether the status of Carlton and Redstone as organizations recognized by the Internal Revenue Service ("I.R.S.") as being exempt from federal income tax under I.R.C. § 501(c)(3) ("501 (c)(3) status") is controlling with regard to the exemption of their properties from state or local ad valorem taxation. We begin our analysis with the language of § 40-9-1(1), which exemptsproperty based on its exclusively charitableuse, not on the tax-exempt status of the entity
owning the property.[11] See Ala. Att'y Gen. Op. No. 2001-191 (May 25, 2001) (Alabama grants an exemption from state income tax to organizations with federal 501(c)(3) status, but there is no analogous exemption from ad valorem taxes; the charitable use of property is a question for the taxing authority to determine). Thus, the text of the statute does not support the theory that 501(c)(3) status is controlling with respect to an exemption from ad valorem taxes. See alsoState v. Church of the Advent, 208 Ala. 632, 95 So. 3
(1923) (real property owned by a church, but leased for a commercial use, was not exempt from ad valorem taxation because the property was not used for religious purposes). *Page 1020 
In Mingledorff v. Vaughan Regional Medical Center,Inc., 682 So.2d 415 (Ala. 1996), our Supreme Court implicitly rejected the theory that 501(c)(3) status automatically entitles a taxpayer to exemption from ad valorem taxation. In affirming the ad valorem tax exemption of two charitable hospitals, the Court noted that the hospitals were recognized by the I.R.S. as tax-exempt charitable hospitals, but it did not treat the I.R.S. determination of the hospitals' charitable status as controlling. Instead, the Court stated:
 "The dispositive issue is whether the property sought to be taxed, which is being used exclusively as a hospital, is being used exclusively in charitable pursuits. If it is, then there is no question that [the hospitals] are exempt from ad valorem taxation under the clear wording of Amendment 373(k) and § 40-9-1(1)."
Vaughan Reg'l Med. Ctr., 682 So.2d at 416 (emphasis added).
Our Supreme Court then engaged in a lengthy analysis of whether the hospitals' activities were properly considered to be "charitable" under both Alabama law and the applicable federal tax regulations. Had the I.R.S.'s determination of the hospitals' 501(c)(3) status been controlling, the extensive legal analysis would have been unnecessary.
We conclude that the 501(c)(3) status of an entity does not automatically exempt the entity's property from ad valorem taxation.[12] Instead, property is exempt from ad valorem taxation only if it is "used exclusively . . . for purposes purely charitable" as defined by Alabama law. Accordingly, the dispositive question before us is whether the facilities at issue are so used.
We note that the operation of an apartment complex for low-income and fixed-income elderly can be a charitable purpose under § 40-9-1(1). Monroe v. Baptist HealthCare Found., 772 So.2d 414 (Ala. 2000). Monroe is not, however, dispositive as to this case because (1) it was undisputed that Bell Oaks, the facility at issue in that case, was built for a charitable purpose, (2) $2.8 million of Bell Oaks's capital debt was repaid by charitable contributions from other Baptist entities, and (3) Bell Oaks served people of low and modest income, a group traditionally considered to be proper objects of charity. Further, the question before the Supreme Court in Monroe was not the general scope of the charitable exemption applicable to housing for the elderly, but the more limited question whether the charitable tax exemption was lost because the apartment facility at issue earned a slight profit over its operating costs or because it did not serve the sick or the indigent.
Because § 40-9-1(1) and Amendment No. 373(k) do not define "charity" or "charitable," we take note of the definitions set forth in Vaughan Regional Medical Center. In that case, our Supreme Court held that two charitable hospitals did not lose their ad valorem tax exemptions by operating a parking deck, a cafeteria, *Page 1021 
and a gift shop to generate income and by charging fees to a majority of its patients. The Court noted, however, (1) that it was undisputed that the hospitals at issue were created for charitable purposes, (2) that the hospitals at issue made their services available to a large part of the population, including the poor, and (3) that the hospitals had "an `open door' policy in that they [did] not turn away patients who [were] unable to pay for medical services." Vaughan Reg'l Med. Ctr.,682 So.2d at 418. Those three factors distinguish the hospitals in that case from the retirement facilities at issue in this case.
In analyzing whether the hospitals at issue in VaughanRegional Medical Center were engaged in a charitable activity, our Supreme Court considered the definitions of "charitable" and "charity" under Alabama law and the I.R.S. regulations specifically defining the scope of the charitable exemption for hospitals. Our Supreme Court began with the following definitions of charitable uses:
 "In order to qualify for the total ad valorem tax exemption provided by Amendment 373(k) and § 40-9-1(1), Vaughan and Baptist [hospitals] must use their property exclusively for charitable purposes or, as this Court stated in [Most Worshipful Grand Lodge of Free Accepted Masons v. Norred, 603 So.2d 996, 1000 (Ala. 1992)], they must use it `solely, only, or wholly for a . . . charitable purpose.' In Henderson v. Troy Bank Trust Co., 250 Ala. 456, 466, 34 So.2d 835, 841 (1948), this Court, quoting Johnson v. Holifield, 79 Ala. 423, 425 (1885), discussed the nature of a `charity':
 "`"A charity, in the legal sense, may be more fully defined as a gift, to be applied consistently with existing laws, for the benefit of an indefinite number of persons, either by bringing their minds or hearts under the influence of education or religion, by relieving their bodies from disease, suffering, or constraint, by assisting them to establish themselves in life, or by erecting or maintaining public buildings or works, or otherwise lessening the burdens of government. It is immaterial whether the purpose is called charitable in the gift itself, if it is so described as to show that it is charitable in its nature."'
 "This definition is consistent with the definition of `charity' set out in Black's Law Dictionary
(6th ed.1990):
 "`A gift for, or institution engaged in, public benevolent purposes. A gift for benefit of indefinite number of persons under influence of religion or education, relief from disease, assisting people to establish themselves in life, or erecting or maintaining public works. . . . A "charity," in the absence of legislative definition, is attempt in good faith, spiritually, physically, intellectually, socially and economically to advance and benefit mankind in general, or those in need of advancement and benefit in particular, without regard to their ability to supply that need from other sources and without hope or expectation, if not with possible abnegation, of gain or profit by donor or by instrumentality of charity.'"
Vaughan Regl Med Ctr., 682 So.2d at 418 (emphasis added).
The Court in Vaughan Regional Medical Center also considered I.R.S. regulations and revenue rulings governing the tax exemption for charitable hospitals, which it found to be consistent with Alabama law. 682 So.2d at 421. Our Supreme Court quoted extensively from Revenue Ruling 56-185, 1956-1 C.B. 202, which provides, among other things, (1) *Page 1022 
that a charitable hospital "`must be operated to the extent of its financial ability for those not able to pay for the services rendered and not exclusively for those who are able and expected to pay,'" and (2) that if a hospital "`operates with the expectation of full payment from all those to whom it renders services, it does not dispense charity merely because some of its patients fail to pay for the services rendered.'"
The Court in Vaughan Regional Medical Center held that a charitable hospital does not necessarily lose its charitable exemption by charging commercially reasonable fees to those patients who can afford to pay, as long as it provides health services to the public at large and does not exclude those who cannot pay. Vaughan Regl Med. Ctr., 682 So.2d at 421.
Applying the foregoing definitions and principles to the facts of this case, it clearly appears that there is, at a minimum, substantial evidence that Carlton Cove and Redstone Village are not exclusively "charitable" facilities. Those facilities appear to benefit primarily private, rather than public, interests to the extent that they serve only a limited number of elderly persons with significant financial resources. Instead of benefiting the general public, either by offering care to those of limited means or by lessening the burdens of governments, Carlton Cove and Redstone Village provide primarily "self-benevolence" — the creation of benefits for the residents collectively using their own money. The fee structures of Carlton Cove and Redstone Village can be viewed as a form of prepaid long-term-care insurance in which the entrance fee and the monthly service fees during the residents' early, healthier years generate surpluses to fund the more expensive care required in later years. Further, both facilities admit only residents who can pay the full estimated costs of lifetime care, and neither facility makes any effort to provide services to those who do not satisfy the minimum asset and income requirements. Indeed, both facilities refuse to accept Medicaid patients in their skilled-nursing facilities.
Although a charitable facility, to be considered as such, is not limited in its enterprise to the provision of free or reduced-cost services, there must be an element of gift and of service to the general public. There is at least substantial evidence that this public benefit is not present in the facilities at issue here, given the luxury accommodations, the high fees, and the limited number of elderly persons who meet the facilities' financial guidelines.[13]
Our conclusion is strengthened by an examination of applicable I.R.S. revenue rulings. Revenue Ruling 79-18, 1979-1 C.B. 194, provides that charitable activities include the provision of housing for the elderly and the relief of distress of the elderly. That revenue ruling provides that an elderly housing facility may charge residents substantial fees (including substantial entrance fees) without losing its charitable character, provided (1) that the cost "is within the financial reach of a significant segment of the community's elderly persons," (2) that the housing is operated at the "lowest feasible cost," and (3) that *Page 1023 
the organization commits itself to maintaining in residence those tenants who become unable to pay the monthly fees. Rev. Rul. 79-18; see also Rev. Rul. 72-124, 1972-1 C.B. 145. There was substantial evidence in the record that Carlton Cove and Redstone Village would not satisfy these criteria.
Finally, decisions from other states also support our conclusion, indicating that the operation of an upscale retirement community such as those at issue here is not a "charitable" use of the properties at issue. In WesternMassachusetts Lifecare Corp. v. Board of Assessors ofSpringfield, 434 Mass. 96, 747 N.E.2d 97 (2001), for example, the court held that the charitable exemption from ad valorem taxation did not extend to a "luxury residential complex," 434 Mass. at 98, 747 N.E.2d at 100, that was similar in facilities, concept, and cost to Carlton Cove and Redstone Village. The court noted that a charity need not serve the poor to qualify for the exemption and that a charity may charge reasonable fees without losing its charitable exemption. The court held, however, that to be charitable, an organization must make its services accessible to a sufficiently large and indefinite class and that it may not limit its services to those who are financially well off. Thus, the retirement facility at issue in that case provided a valuable service to those who could afford a luxury residence, but it did not qualify as a charity because its services were not available to a sufficiently large segment of the population. The court held that "[t]his form of addressing the needs of the elderly, however much it may benefit those fortunate enough to qualify for it, is indeed `remote' from our traditional concept of charity." 434 Mass. at 105, 747 N.E.2d at 105. See alsoMaplewood Cmty., Inc. v. Craig, 216 W.Va. 273, 285,607 S.E.2d 379, 391 (2004) (luxury retirement facilities were not purely charitable because their costs were not "`within the financial reach of a significant segment of the community's elderly persons'"); Bethesda Barclay House v.Ciarleglio, 88 S.W.3d 85, 95 (Mo.Ct.App. 2002) (a "`premier retirement facility' with extravagant and luxurious amenities" did not qualify for a charitable exemption because its services were denied to a large percentage of the elderly population; to be charitable, a home for the elderly must be available to both rich and poor). Compare Southminster, Inc. v. Justus,119 N.C.App. 669, 459 S.E.2d 793 (1995) (holding that two nonprofit retirement communities qualified for a charitable exemption even though they charged substantial entrance fees and monthly fees; housing for the elderly was held to be a charitable purpose, but the court did not address whether the services at issue were made available to a substantial part of the elderly population); Board of Tax Assessors of WareCounty v. Baptist Village, Inc., 269 Ga.App. 848,605 S.E.2d 436 (2004) (nonprofit retirement facility was exempt from ad valorem taxation under a statute that exempted homes for the aged operated by an entity with 501(c)(3) status); andPresbyterian Manors, Inc. v. Douglas County,268 Kan. 488, 998 P.2d 88 (2000) (a non-profit retirement home was entitled to a charitable exemption under a state statute that expressly referenced I.R.S. Revenue Ruling 72-124 as controlling; the opinion did not disclose the entrance fees or monthly fees charged, nor did it discuss the extent to which the facility was within the financial means of a significant portion of the elderly population).
Carlton Cove and Redstone Village certainly appear to be reputable enterprises that serve well those who can afford the cost of the facilities and services offered. On the record presented, however, it clearly appears that there is at least substantial evidence that the facilities at issue are not *Page 1024 
used for exclusively charitable purposes under § 40-9-1(1). Thus, it cannot be said that Carlton Cove and Redstone Village met their burden of establishing that there is no genuine issue of material fact and that they are entitled to a judgment as a matter of law.
Accordingly, we reverse the trial court's judgment and remand the cause for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
CRAWLEY, P.J., and PITTMAN and BRYAN, JJ., concur.
THOMPSON, J., concurs in the result, without writing.
[1] Surtees's appeal, no. 2041091, and Hamilton's appeal, no. 2050063, were initially filed with our Supreme Court and were transferred to this court, pursuant to Ala. Code 1975, §12-2-7. Those appeals were consolidated by this court.
[2] The amended appeal, no. 2050261, was consolidated with appeal nos. 2041091 and 2050063.
[3] A continuing-care retirement facility offers the elderly a range of living arrangements and levels of care within the same facility. A continuing-care retirement community typically offers independent-living apartments or cottage-style homes for those who are self-sufficient, assisted-care units for those who need some assistance with nonmedical activities of daily living (dressing, bathing, walking, etc), and skilled-nursing care for those whose health is deteriorating. A major advantage of a continuing-care retirement facility is that the resident can obtain various levels of care within the same community, thus maintaining a consistent environment and continuity of care when the resident's needs change. See Elizabeth C. Kastenberg and Joseph Chasin, Exempt OrganizationsContinuing Professional Education (CPE) Technical InstructionProgram FY 2004 (Internal Revenue Service).
[4] Residents in independent-living units are self-sufficient and have freedom to drive automobiles, travel, and come and go as they please. Carlton Cove's independent-living units consist of 113 apartments ranging in size from 779 square feet to approximately 1,600 square feet, 48 duplexes of approximately 1,500 square feet, and a manor house of approximately 2,000 square feet.
[5] All of the fees and financial guidelines discussed in this opinion were current as of early 2005.
[6] The minimum net asset level includes the value of the prospective resident's current residence. The recommended minimums for a couple desiring to live in the two-bedroom manor house are net assets of $591,000 and a monthly income of $7,213.
[7] As part of the admission process, Carlton uses financial screening software to determine the actuarial risk that the prospective resident will become unable to pay his or her monthly service fees and will exhaust the refundable portion of his or her entrance fee. Carlton's executive director testified that she was not aware of any current resident of Carlton Cove who had an actuarial risk of nonpayment greater than 0%.
[8] The bondholders have been active in the management of Carlton Cove and have exercised their contractual right to require Carlton to hire a management consultant selected by the bondholders. There is evidence in the record indicating that the bondholders' consultant has caused changes to be made in the operation of Carlton Cove.
[9] Redstone Village was initially planned as a facility limited to retired military personnel and their spouses. Before it opened, it was also made available to the general public.
[10] The monthly service fee at Redstone Village covers 20 or 30 meals per month, utilities, housekeeping, scheduled local transportation, and similar services.
[11] In comparison, the legislature has seen fit to create other tax exemptions based expressly on the federal tax-exempt status of the entity. See, e.g., Ala. Code 1975, §40-23-5 (any rescue service granted 501(c)(3) status is exempt from sales tax), and Ala. Code 1975, § 40-18-32 (any entity exempt from federal income tax is also exempt from state income tax).
We also note that §§ 40-9-12 and -13, Ala. Code 1975, exempt from taxation a number of specifically named nonprofit organizations, including the Presbyterian Apartments, Incorporated, which owns and operates an apartment facility in Huntsville to serve the elderly.
[12] We note that the record does not reveal what information was before the I.R.S. when it issued the determination letters recognizing the 501(c)(3) status of Carlton and Redstone. It is clear, however, that the I.R.S. decisions on both entities were based on projected and anticipated activities because the determination letters were issued before construction of the respective facilities began. We also note that the granting of 501(c)(3) status to Carlton and Redstone was a non-adversarial administrative decision of a federal agency made without notice to or participation of the taxing authorities and that the record does not reflect what scrutiny, if any, was given to the documents submitted to the I.R.S. by Carlton and Redstone.
[13] We note that the facilities, amenities, and rates at issue here are comparable to those of at least one for-profit retirement community in Huntsville, namely Somerby at Jones Farm, a competing upscale retirement community that pays ad valorem taxes. In contrast, the Presbyterian Apartments, a tax-exempt independent-living apartment facility serving the low-income elderly, charges less than $500 per month for its most expensive apartments. See note 11, supra, regarding the legislative prescription of the Presbyterian Apartments' tax-exempt status.